Tina Wolfson, CA Bar No. 174806
twolfson@ahdootwolfson.com
Theodore Maya, CA Bar No. 223242
tmaya@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
10728 Lindbrook Dr.
Los Angeles, CA 90024
Telephone: (310) 474-9111
Fax: (310) 474-8585

Daniel S. Robinson, CA Bar No. 244245
drobinson@robinsonfirm.com
Wesley K. Polischuk, CA Bar No. 254121
wpolischuk@robinsonfirm.com
**ROBINSON CALCAGNIE, INC.**
19 Corporate Plaza Dr.
Newport Beach, CA 92660
Telephone: (949) 720-1288
Fax: (949) 720-1292

*Interim Co-Lead Counsel for Plaintiffs*
*and the Proposed Class*
[Additional Counsel Listed Below Signatures]

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# SOUTHERN DIVISION

| | |
|---|---|
| **IN RE EXPERIAN DATA BREACH LITIGATION** | Case No. 8:15-cv-01592 AG (DFMx) |
| | Hon. Andrew J. Guilford |
| | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PRELIMINARY APPROVAL** |
| | Date:   December 3, 2018 |
| | Time:  10:00 a.m. |
| | Room:  Court 10D |
| | [Filed Concurrently with Notice, Declarations and Preliminary Approval Order] |

1

1
2

# <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ...................................................................................1

II.    BACKGROUND ...................................................................................3

    A.    The Data Breach, Commencement of Litigation, and Plaintiffs' Self-Organization ................................................3

    B.    Class Representative Vetting ..................................................4

    C.    The Pleadings .........................................................................4

    D.    Discovery ...............................................................................5

    E.    Settlement Negotiations .........................................................7

III.   TERMS OF THE SETTLEMENT ........................................................8

    A.    The Class Definition ..............................................................8

    B.    The Settlement Benefits ........................................................9

        1.    Credit Monitoring and Insurance Services .......................9

        2.    Cash Payment for Reimbursement of Out-of-Pocket Costs ...........................................................10

        3.    Cash Payment for Documented Time and Default Time ......................................................................11

        4.    Remedial Measures Attributable to the Settlement ........12

        5.    The Settlement's Value to Settlement Class Members ..12

        6.    Plan of Distribution ...........................................................14

        7.    Notice to Class ..................................................................15

        8.    Proposed Class Representative Service Awards ............15

        9.    Attorneys' Fees and Costs ...............................................16

        10.   The Settlement Administrator .........................................17

IV.    PRELIMINARY APPROVAL IS APPROPRIATE...........................17

i

A.   Legal Standards.................................................................17

    1.   Class Certification .................................................17

    2.   Fairness of the Proposed Class Action Settlement.........18

B.   Discussion ..................................................................20

    1.   Class Certification ................................................20

    i.   The Class is Sufficiently Numerous ................................20

    ii.   There are Common Questions of Law and Fact.............20

    iii.   The Class Representatives' Claims are Typical of Those of Other Class Members ......................................20

    iv.   Class Representatives and Class Counsel Adequately Represent Class Members ................................................21

    v.   The Settlement Class Meets the Requirements of Rule 23(b)(3) Because Common Issues of Law and Fact Predominate ............................................................23

    2.   The Proposed Settlement Should be Preliminarily Approved ................................................25

    i.   The Strength of Plaintiffs' Case .....................................25

    ii.   The Risk, Expense, Complexity, and Likely Duration of Further Litigation .........................................26

    iii.   The Risk of Maintaining Class Action Status Throughout the Trial.........................................................26

    iv.   The Amount Offered in Settlement .................................27

    v.   The Extent of Discovery Completed and the Stage of the Proceedings.................................................28

    vi.   The Experience and Views of Counsel ..........................29

    vii.   The Presence of a Governmental Participant .................29

    viii.   The Reaction of the Class Members to the Proposed Settlement ......................................................29

ii

3.   The Settlement was the Product of Arm's-Length Negotiations ............................................29

4.   The Proposed Notice is Appropriate ..............................30

5.   Claim Process Is Easy and not Cumbersome .................32

6.   The Court Should Set Settlement Deadlines and Schedule a Fairness Hearing ..........................................................33

V.   CONCLUSION .....................................................................................33

MEMORANDUM OF POINTS AND AUTHORITIES ISO PRELIMINARY APPROVAL

# TABLE OF AUTHORITIES

Cases

*Abat v. Chase Bank USA, N.A.*, No. SACV0701476CJCANX, 2011 WL 13130637 (C.D. Cal. July 11, 2011) ...............................................................................31

*Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952 (9th Cir. 2013) ...........................20

*Allstate Ins. Co. v. Hauge*, 449 U.S. 302 (1981) .....................................................24

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ...........................................17

*Barbosa v. Cargill Meat Sols. Corp.*, 297 F.R.D. 431 (E.D. Cal. 2013)..................22

*Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566 (9th Cir. 2004) ..................18, 19

*Class Plaintiffs v. City of Seattle*, 955 F.2d 1268 (9th Cir.)..............................18, 19

*Corona v. Sony Pictures Entm't, Inc.*, No. 14-CV-09600 RGK EX, 2015 WL 3916744 (C.D. Cal. June 15, 2015)....................................................................24

*Ellis v. Costco Wholesale Corp.*, 657 F.3d 970 (9th Cir. 2011)..............................21

*General Tel. Co. v. Falcon*, 457 U.S. 147 (1982) ...................................................22

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998)................................19, 21

*Harris v. Vector Mktg. Corp.*, 2011 WL 1627973 (N.D. Cal. 2011) ......................19

*Hoffer v. City of Seattle*, 506 U.S. 953 (1992) ........................................................18

*In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011).......19, 29

*In re Emulex Corp. Sec. Litig.*, 210 F.R.D. 717 (C.D. Cal. 2002) ..........................22

*In re Hyundai & Kia Fuel Economy Litigation,* 881 F.3d 679 (9th Cir. 2018) .......25

*In re Michaels Stores Pin Pad Litig.*, No. 11-cv-03350 (N.D. Ill. Mar. 3 & April 17, 2013).......................................................................................................14

*In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410 (3d Cir.).......................................................................................................16

*In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934 (9th Cir. 2015)................16

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450 (D.N.J. 1997)....................................................................................................32

*In re the Home Depot, Inc., Customer Data Sec. Breach Litig.*, No. 1:14-MD-02583-TWT, 2016 WL 6902351 (N.D. Ga. Aug. 23, 2016) ................................23

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liability Litig.*, 978 F. Supp. 2d 1053 (C.D. Cal. 2013)...........................25

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 895 F.3d 597 (9th Cir. 2018)........................................................................21

MEMORANDUM OF POINTS AND AUTHORITIES ISO PRELIMINARY APPROVAL

*Jordan v. Cnty. of Los Angeles*, 669 F.2d 1311 (9th Cir.)........................................20

*Krottner v. Starbucks Corp.*, 406 Fed.Appx. 129 (9th Cir. 2010)...........................26

*Local Joint Exec. Bd. Of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152 (9th Cir. 2001)...................................................................................25

*Lockwood v. Certegy Check Svcs., Inc.*, No. 07-cv-01434 (M.D. Fla. Sept. 3, 2008) ....................................................................................................................................14

*Mazza v. Am. Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012)..............................20

*McCann v. Foster Wheeler LLC*, 48 Cal. 4th 68 (Cal. 2010)...................................24

*Mercury Interactive Corp. Sec. Litig. v. Mercury Interactive Corp.*, 618 F.3d 988 (9th Cir. Cal. 2010) ..................................................................................................17

*Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) .......................31

*Noll v. eBay, Inc.*, 309 F.R.D. 593 (N.D. Cal. 2015) ..............................................31

*Officers for Justice v. Civil Service Comm'n of the City & Cnty. of San Francisco*, 688 F.2d 615 (9th Cir. 1982)...................................................................................18

*Otsuka v. Polo Ralph Lauren Corp.*, 251 F.R.D. 439 (N.D. Cal. 2008) .................25

*Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979 (9th Cir. 2015).......23, 24

*Reppert v. Marvin Lumber & Cedar Co.*, 359 F.3d 53 (1st Cir. 2004)....................31

*Sandoval v. Roadlink USA Pac., Inc.*, No. EDCV 10-00973 VAP, 2011 WL 5443777 (C.D. Cal. Oct. 9, 2011) ..........................................................................17

*Schulein v. Petroleum Dev. Corp.*, No. SACV111891AGANX, 2015 WL 12698312 (C.D. Cal. Mar. 16, 2015) ........................................................................16

*Silber v. Mabon*, 18 F.3d 1449 (9th Cir. 1994) ......................................................31

*Spann v. J.C. Penney Corp.*, 314 F.R.D. 312 (C.D. Cal. 2016) ..............................19

*Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003)....................................17, 18, 19

*Stone v. Howard Johnson Int'l, Inc.*, No. 12CV01684PSGMANX, 2015 WL 13648551 (C.D. Cal. June 15, 2015).......................................................................31

*Thomas v. Baca*, 231 F.R.D. 397 (C.D. Cal. 2005)................................................21

*Tijero v. Aaron Bros., Inc.*, 2013 WL 60464 (N.D. Cal. 2013)..............................19

*Trotsky v. Los Angeles Fed. Sav. & Loan Ass'n.*, 48 Cal.App.3d 134 (1975) .........31

*Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150 (9th Cir. 2016)..............23

*Vizcaino v. Microsoft Corp.*, 290 F.3d 1043 (9th Cir. 2002) .................................16

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011)......................................18, 23

MEMORANDUM OF POINTS AND AUTHORITIES ISO PRELIMINARY APPROVAL

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir.).............................31

*Warner v. Toyota Motor Sales, U.S.A., Inc.*, No. CV152171FMOFFMX, 2016 WL
    8578913 (C.D. Cal. Dec. 2, 2016) ........................................................................31

*Wash. Mut. Bank v. Superior Court*, 24 Cal. 4th 906 (Cal. 2001) ...........................24

*Wershba v. Apple Computer, Inc.*, 91 Cal.App.4th 224 (2001) ...............................31

*West v. Circle K Stores, Inc.*, 2006 WL 1652598 (E.D. Cal. 2006).........................19

*Wright v. Linkus Enters., Inc.*, 259 F.R.D. 468 (E.D. Cal. 2009) ...........................19

**Other Authorities**

4 Newberg on Class Actions § 11:53 (4th ed. 2013)..................................................31

Class Action Fairness Act, 28 U.S.C. § 1715...........................................................29

MANUAL FOR COMPLEX LITIGATION § 30.212 (4th ed. 2004) ...................................32

**Rules**

Fed. R. Civ. P. 23(a) ................................................................18, 20, 21, 23

Fed. R. Civ. P. 23(b) ......................................................................18, 20, 23

Fed. R. Civ. P. 23(c) .......................................................................30, 32

Fed. R. Civ. P. 23(e) ...............................................................18, 19, 30, 32

MEMORANDUM OF POINTS AND AUTHORITIES ISO PRELIMINARY APPROVAL

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Plaintiffs request that the Court preliminarily approve the proposed class action settlement ("Settlement") that would resolve claims arising out of the data breach that Defendants Experian Information Solutions, Inc. and Experian Holdings, Inc. (collectively, "Experian" or "Defendants") announced that they experienced on October 1, 2015, which compromised the personal information of nearly 16 million consumers (the "Data Breach").  The personal information compromised in the Data Breach included the names, addresses, Social Security numbers, dates of birth, identification numbers (*e.g.* driver's license numbers, military ID numbers, or passport numbers), and other personally identifiable information (collectively, "PII").

The total value of the Settlement is likely to exceed $47 million,[1] consisting of a $22 million non-reversionary Settlement Fund, at least $11.7 million for Experian's remedial measures implemented as a result of this litigation, and $7,638,786.22 for every one-tenth of one percent (0.1%) of Class Members who submit claims to receive the Credit Monitoring and Insurance Services.[2]  Each Settlement Class Member will be eligible to receive both Credit Monitoring and Insurance Services and one of two types of cash payments, in addition to reimbursement of their Out-of-

---

[1] The Settlement Value of $47 million assumes that a minimum of two-tenths of one percent (0.2%) of Class Members make a claim for Credit Monitoring and Insurance Services, as explained in more detail in Section III.B.5, below.  Included at page 14 is a chart depicting the Settlement Value at different claim rates.  All capitalized terms have the meaning ascribed to them in the Settlement Agreement.

[2] The retail value of the Credit Monitoring and Insurance Services offered under the Settlement is $19.99 per month (*see* www.identityguard.com/plans/total), which comes to $7,638,786.22 for every 0.1% of Class Members that elect to receive this benefit, before accounting for the cost of providing those Credit Monitoring and Insurance Services through the Settlement.  Plaintiffs' counsel have negotiated an offer under which the total cost of providing these Services cannot exceed $2.5 million, and these costs are figured into the $47 million figure cited in the text. (Declaration of Tina Wolfson ("Wolfson Decl.") ¶¶ 7, 41; Declaration of Daniel S. Robinson ("Robinson Decl.") ¶¶ 6, 40.)

MEMORANDUM OF POINTS AND AUTHORITIES ISO PRELIMINARY APPROVAL

Pocket Costs. The Settlement was achieved after over two years of hard-fought litigation, a decision on the motion to dismiss, significant discovery on both sides, including the production and review of hundreds of thousands of pages of documents, numerous contested discovery-related disputes, four percipient witness and Rule 30(b)(6) depositions, and several rounds of mediation.

The $22 million Settlement Fund will be used to provide: (1) two years of an enhanced version of Identity Guard's Individual Total Plan ("Credit Monitoring and Insurance Services") to any Class Member who submits a valid claim, (2) cash payments to Class Members who submit valid claims for Out-of-Pocket Costs and Documented Time spent due to the Data Breach, and (3) cash payments of up to $40 to Class Members who submit valid claims but do not receive a payment for Documented Time. The Settlement Fund also will be used to pay for class notice, as well as settlement administration, and any Service Awards for the Class Representatives and attorneys' fees and costs approved by the Court.

The $11.7 million of remedial and enhanced security measures Experian has undertaken, and will continue to implement, as a result of this litigation and Settlement include numerous security enhancements to Experian's network, remediation of additional vulnerabilities, heightened encryption throughout its network and user database, implementation of a Security First Program consisting of 82 security-related projects, and hiring an additional 60 full-time employees. (*See* Settlement Ex. F, Declaration of Stan Thompson ("S. Thompson Decl.") ¶¶ 8-9.)

The Settlement is a favorable one for the Settlement Class. It provides meaningful and direct relief in the form of additional years of credit monitoring and insurance services, the opportunity to submit claims for out-of-pocket and time losses, and enhanced protection of Class Members' PII. In light of the valuable benefits conveyed to members of the Settlement Class, and the significant risks faced through continued litigation, the terms of the Settlement meet the "fair, reasonable, and adequate" requirements for preliminary approval. Fed. R. Civ. P. 23(e)(2). The

2

Court should grant preliminary approval to the Settlement.

## II.   BACKGROUND

### A.   The Data Breach, Commencement of Litigation, and Plaintiffs' Self-Organization

On October 1, 2015, Experian announced that it "experienced an unauthorized acquisition of information from a server" that held the personal information of more than 15 million consumers in the United States, including those "who applied for T-Mobile USA postpaid services or device financing from September 1, 2013 through September 16, 2015."   The PII included the names, addresses, Social Security numbers, dates of birth, identification numbers (*e.g.* driver's license numbers, military ID numbers, or passport numbers), and other personally identifiable information.  Following Experian's announcement, over 40 complaints related to the Data Breach were filed against Experian across the Country, the first of which, *Bhuta v. Experian Information Solutions, Inc.*, No. 8:15-cv-1592 (filed October 2, 2015), was assigned to this Court.  After MDL proceedings were instituted (MDL No. 2676) all plaintiffs' counsel voluntarily transferred their cases to this Court and the MDL was deemed moot.  The Court consolidated the cases on December 16, 2015. (Dkt. 60.)

After transfer, Tina Wolfson of Ahdoot & Wolfson, PC and Daniel S. Robinson of Robinson Calcagnie, Inc. engaged in further meet-and-confer efforts to agree on a leadership structure so that Plaintiffs' case could move forward promptly and efficiently.  (Wolfson Decl. ¶ 10; Robinson Decl. ¶ 9.)  Ultimately, the majority of plaintiffs' counsel supported these two attorneys' Motion for Appointment of Interim Co-Lead Class Counsel and Plaintiffs' Steering Committee and, on February 10, 2016, the Court appointed Ms. Wolfson and Mr. Robinson as interim co-lead class counsel, and appointed a Plaintiffs' Steering Committee ("PSC") consisting of attorneys from several other law firms (collectively, "Class Counsel").  (Dkt. 130.)

///

MEMORANDUM OF POINTS AND AUTHORITIES ISO PRELIMINARY APPROVAL

### B.    Class Representative Vetting

Before and immediately after the leadership appointment, Class Counsel collaborated with all plaintiffs' counsel — including counsel who submitted competing leadership applications — to ensure that all plaintiffs preserved relevant documents, and to vet all prospective plaintiffs for a consolidated amended complaint ("CAC"). In the months leading up to the Court-imposed deadline to file the CAC, Class Counsel worked cooperatively and efficiently with other plaintiffs' retained counsel to review underlying complaints, documents, and questionnaires, and conduct telephonic vetting interviews of over 100 potential class representatives. The leading candidates were then further screened and vetted, until 58 class representatives were selected. (Wolfson Decl. ¶ 15; Robinson Decl. ¶ 14.)

### C.    The Pleadings

Drawing upon the PSC's respective expertise on particular state law issues, Plaintiffs drafted and filed their CAC on April 15, 2016, alleging Experian breached its duties under numerous state and federal laws by, among other things: (a) failing to implement and maintain adequate data security practices to safeguard Plaintiffs' and Class Members' PII; (b) failing to detect the Data Breach in a timely manner; (c) failing to disclose that Defendants' data security practices were inadequate to safeguard Class Members' PII; and (d) failing to provide adequate and timely notice of the Data Breach.  (Dkt. 151; Wolfson Decl. ¶ 16; Robinson Decl. ¶ 15.)

Plaintiffs alleged claims for violation of the Fair Credit Reporting Act ("FCRA"), negligence, negligence *per se*, and violations of 44 state statutes, and proposed to represent a nationwide class and statewide subclasses for Alabama, Arizona, California, Colorado, Delaware, District of Columbia, Florida, Georgia, Hawaii, Illinois, Indiana, Kentucky, Massachusetts, Michigan, Minnesota, Missouri, Nevada, New Jersey, New Mexico, New York, North Carolina, Ohio, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, and Washington.  (Dkt. 151.)

4

After significant meet-and-confer efforts between the parties, and discussions with the Court during Case Management Conferences as to how best to streamline the initial phase of this litigation, the parties stipulated that Experian's motion to dismiss under Federal Rules of Civil Procedure ("FRCP") 12(b)(6) would be limited to address Plaintiffs' FCRA claims and state law claims for California, Illinois, New York, and Ohio. (Wolfson Decl. ¶ 17; Robinson Decl. ¶ 16.)  After briefing, the Court heard oral argument and issued an order granting in part and denying in part Experian's motion to dismiss. (Dkt. 213.) The Court dismissed Plaintiffs' FCRA claims but rejected Experian's argument that the economic loss rule precludes the negligence causes of action, and upheld most of the state consumer claims.  *Id.* Experian answered the CAC on February 13, 2017. (Dkt. 215.)

The parties continued to discuss management of the case and appeared at regular case management conferences to update the Court on the status of the litigation. (Wolfson Decl. ¶ 13; Robinson Decl. ¶ 12.)  Following the Court's setting of a Scheduling Conference for January 29, 2018, Plaintiffs prepared and shared with Experian a draft motion for class certification, which Plaintiffs intended to file in February 2018.  (Wolfson Decl. ¶ 29; Robinson Decl. ¶ 28.)

### D.   Discovery

Discovery efforts in the litigation were significant on the part of both sides, and numerous disputes were highly contested. While most disputes were resolved by the parties, several were briefed and argued to the Court.  First, there was a dispute over the number of custodians whose electronically stored information ("ESI") would be produced.  (Wolfson Decl. ¶ 23; Robinson Decl. ¶ 22.)  Experian asked the Court to limit the number to 15 while Plaintiffs asked that the limit be 75.  After briefing and oral argument, the Court ordered a soft custodian cap of 50, but allowed Plaintiffs to seek an increase of the number of custodians in the future if necessary.  (Dkt. 157.)

Second, the Parties disputed whether Experian would be allowed to redact for relevancy in its ESI production.  The Court ordered the parties to submit a joint

5

statement regarding the parties' positions on redaction for each category of information.   (Dkt. 172.)   Noting the "exponentially increasing expense and complexity of waging discovery wars in large, class-action cases," the Court granted Plaintiffs' proposal on all 15 categories of information on July 25, 2016.  (Dkt. 183.)

Through additional meet-and-confer efforts, and with the Court's input on issues such as the custodian and relevancy redaction issues described above, the parties agreed upon and filed a proposed Protective Order and an ESI Protocol, which the Court approved.  (Dkts. 186-87; Wolfson Decl. ¶ 20; Robinson Decl. ¶ 19.)

Ultimately, Experian produced more than 66,000 documents totaling nearly 300,000 pages, which Plaintiffs reviewed and used in depositions of key witnesses. (Wolfson Decl. ¶ 26; Robinson Decl. ¶ 25.)

Experian served 22 interrogatories and 12 requests for production on Plaintiffs. Plaintiffs served written responses on June 30, 2016 and, the following month, produced nearly 1,200 pages of documents from Plaintiffs. Defense counsel and Class Counsel engaged in significant meet and confer efforts regarding these responses.  (Wolfson Decl. ¶ 21; Robinson Decl ¶ 20.)

Absent from Experian's production was a third-party forensic report regarding the Data Breach.  The parties spent significant time meeting and conferring over its production, which raised a dispute concerning Experian's privilege log concerning the report and related documents it withheld from production. (Wolfson Decl. ¶ 25; Robinson Decl. ¶ 24.)   Ultimately, Plaintiffs filed a motion to compel, which Experian opposed.  (Dkts. 231-38.)

The Court denied Plaintiffs' motion to compel, and the parties then engaged in extensive negotiations concerning Plaintiffs' planned review of the server images on which Experian's forensic consultants relied in producing the forensic report at issue. This required extensive consultation with Plaintiffs' data security expert and a lengthy meet-and-confer process with Experian regarding how production of the server images and their review would be accomplished.  Ultimately, the parties were

able to negotiate a Server Image Review Agreement, which entailed a mutually agreed third-party vendor, arranged for a physically and technologically secure environment in which the review could be conducted, and which specified the costs each party would bear for the review. (Wolfson Decl. ¶ 27; Robinson Decl. ¶ 26.)

Plaintiffs also took the depositions of several key Experian witnesses, including an FRCP 30(b)(6) deposition of Experian's Vice President and Global Head of Corporate Security and Incident Response, and depositions of Experian's Senior Program Manager, Senior Director of IT Development and Information Security, and Vice President of Technology and Client Services. (Wolfson Decl. ¶ 28; Robinson Decl. ¶ 27.)

### E. Settlement Negotiations

Throughout the discovery process, the parties engaged in arm's-length discussions regarding a potential settlement. On March 15, 2017, the parties participated in a private mediation with the Honorable Margaret Nagle (Ret.). (Wolfson Decl. ¶ 30; Robinson Decl. ¶ 29.) Although the parties discussed their respective positions, they made little progress and continued to litigate the case and engage in discovery. (*Id.*) On July 28, 2017, the parties again participated in a private mediation, this time with Judge Carl J. West (Ret.), at which they made significant progress toward resolution of the Action. (Wolfson Decl. ¶ 31; Robinson Decl. ¶ 30.) Following this mediation, the Parties continued to engage in arm's-length settlement discussions with the help of Judge West. (*Id.*) On January 26, 2018, the parties participated in an all-day Settlement Conference with then-sitting Magistrate Judge Jay C. Gandhi (since retired) and reached an agreement in principal. (Wolfson Decl. ¶ 32; Robinson Decl. ¶ 31.)

Since the agreement in principal was reached, the Parties exchanged numerous drafts of the Settlement Agreement and its exhibits, negotiating numerous details to maximize the benefits to the Class. (*Id.*) Class Counsel engaged in a months-long effort with T-Mobile (and a third-party IT consultant selected by T-Mobile) to obtain

7

all available email addresses from T-Mobile records in order to provide the best practical notice while maximizing benefits to Class Members. (*Id.*)

Class Counsel obtained bids from and negotiated with several third-party administrators and Credit Monitoring and Insurance providers in order to get the best deal for the Class. After soliciting competing bids for administration of the Settlement, Class Counsel negotiated an agreement with KCC, LLC ("KCC"), under which KCC's costs will be capped at certain levels, depending on the claim filing rate. More specifically, KCC has agreed not to charge in excess of $1.08 million if the claim rate is 1% or less, $1.205 million if the claim rate is 1%-2%, $1.450 million if the claim rate is 2%-4%, and $1.545 million if the claim rate exceeds 4%. These figures include all costs associated with class member data management, legal notification, telephone support, claims administration, and disbursements and tax reporting; but they do not include postage and costs associated with a potential second distribution, which Class Counsel negotiated along similar claim rate thresholds, at a potential additional cost of $109,476 to $337,722. (Wolfson Decl. ¶ 34; Robinson Decl. ¶ 33.)

Class Counsel also solicited competing bids from alternative providers of Credit Monitoring and Insurance Services in accordance with the Settlement's terms. Ultimately, Class Counsel negotiated for Identity Guard to provide the Settlement's Credit Monitoring and Insurance Services at a cost of $1.3 million to $2.5 million, depending on the number of claimants receiving such services. If 1% or less of the entire Settlement Class submit claims to receive Credit Monitoring and Insurance Services, the cost would be $1.3 million, and if more than 1% submit such claims, the cost would be $2.5 million. (Wolfson Decl. ¶ 36; Robinson Decl. ¶ 35.)

## III.   TERMS OF THE SETTLEMENT

### A.   The Class Definition

The proposed Settlement Class is defined as follows:

The 15,922,099 T-Mobile USA customers or applicants who are

8

1
2
3
4
5
6

identified on the Settlement Class List, including Plaintiffs, whose PII was stored on Experian Information Solutions, Inc.'s and Experian Holdings, Inc.'s server that was accessed by an unauthorized user in the Data Breach. Excluded from the Settlement Class are: (1) the Judges presiding over the Action, and members of their families; (2) the Defendants, their subsidiaries, parent companies, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current or former officers, directors, and employees; (3) Persons who properly execute and submit a Request for Exclusion prior to the expiration of the Opt-Out Period; and (4) the successors or assigns of any such excluded Persons.

7

(Settlement Agreement ¶ 47.)

8

**B.     The Settlement Benefits**

9

The $22 million non-reversionary Settlement Fund will be used to provide

10

Participating Settlement Class Members with the following Settlement Benefits:

11

**1.     Credit Monitoring and Insurance Services**

12

Each Participating Settlement Class Member who submits a valid claim may

13

elect to receive credit monitoring services and identity theft insurance in the form of

14

an enhanced version of a product called Identity Guard Individual Total Plan.

15

(Declaration of Jerry Thompson ("J. Thompson Decl.") ¶ 7.)  The Credit Monitoring

16

and Insurance Services include the following features:

17

a.  Three-Bureau Credit Monitoring;

18

b.  Real-Time Instant Authentication Alerts;

19

c.  LexisNexis Authentication Alerts (covering, for instance, court records);

20

d.  Dark Web Monitoring;

21

e.  Threat Alerts powered by IBM Watson;

22

f.  Customer Support and Victim Assistance;

23

g.  $1 Million reimbursement insurance from AIG;

24

h.  Anti-Phishing & Safe Apps for iOS and Android Mobile devices; and

25

i.  Safe browsing software.

26

(*Id.*; *see also* Robinson Decl. Ex. 1 ¶ 75.)

27

The Credit Monitoring and Insurance Services are superior to many competing

28

products on the market and are tailored to provide Settlement Class Members with

9

the best credit monitoring available.  (J. Thompson Decl. ¶¶ 3-7.)   However, if a claimant already has substantially similar Credit Monitoring and Insurance Services, then the term of the Product offered to that individual under the Settlement will be extended by the remaining term of the individual's existing services, so that he or she nonetheless will receive this valuable benefit.  (*Id.* ¶ 8.)

The Credit Monitoring and Insurance Services, if made available to the general public, would be sold for over $19.99 per month.   (*Id.* ¶ 7; *see also* www.identityguard.com/plans/total (last visited October 24, 2018).)   Accordingly, the value of this benefit to the Class is at least $7,638,786.22 for every 0.1% of Settlement Class Members that elect to receive this benefit, before excluding the cost of the Credit Monitoring and Insurance Services.[3]  (Settlement Agreement ¶ 86; *see also* Declaration of Robert Siciliano ("Siciliano Decl.") ¶¶ 8-9.)

## 2.   Cash Payment for Reimbursement of Out-of-Pocket Costs

In addition to the Credit Monitoring and Insurance Services, each Class Member who submits a valid Claim Form may be entitled to receive up to $10,000 for reimbursement of Out-of-Pocket Costs fairly traceable to the Data Breach.  To receive a payment for Out-of-Pocket Costs, the Participating Settlement Class Member must provide documentation supporting a claim for Out-of-Pocket Costs, including, but not limited to, credit card statements, bank statements, invoices, telephone records, or receipts ("Reasonable Documentation").   (Settlement Agreement ¶¶ 38, 74.)   Out-of-Pocket Costs cannot be documented solely by a personal declaration from the Claimant.  The Out-of-Pocket Costs will be deemed fairly traceable to the Data Breach by the Settlement Administrator if the Out-of-Pocket Costs occurred on or after September 14, 2015, and the Settlement

---

[3] $15,922,099 \times 0.1\% = 15,922$.  $15,922 \times 24$ months $\times \$19.99 = \$7,638,738.72$.  The cost of the Credit Monitoring and Insurance Services will be paid out of the $22 million non-reversionary Settlement Fund, and under no circumstances will those costs exceed $2.5 million. (Wolfson Decl. ¶ 36; Robinson Decl. ¶ 35.)  Class Counsel negotiated a lower cost ($1.3 million) if the participation rate for this benefit is 1% or less.  (*Id.*)

MEMORANDUM OF POINTS AND AUTHORITIES ISO PRELIMINARY APPROVAL

Administrator determines the Out-of-Pocket Costs incurred are related to the type of PII disclosed in the Data Breach.  (*Id.* ¶ 77.)

### 3.     Cash Payment for Documented Time and Default Time

In addition to the Credit Monitoring and Insurance Services and payment for Out-of-Pocket Costs, each Class Member who submits a valid Claim Form may be entitled to receive payment for up to seven hours of lost time fairly traceable to the Data Breach at $20 per hour ("Documented Time").  To receive a payment for Documented Time, the Participating Settlement Class Member must provide Reasonable Documentation.  (*Id.* ¶¶ 39, 75.)  Documented Time cannot be documented solely by a personal certification, declaration or affidavit from the Claimant.  The Documented Time will be deemed fairly traceable to the Data Breach by the Settlement Administrator if the Documented Time occurred on or after September 14, 2015, and the Settlement Administrator determines the Documented Time incurred is related to the type of PII disclosed in the Data Breach.  (*Id.* ¶ 78.)

All Class Members who submit a valid Claim Form (for Credit Monitoring and/or Out-of-Pocket Costs) and do not elect to receive a payment for Documented Time, or whose claim for Documented Time is rejected by the Settlement Administrator, will receive a payment for lost time addressing or remedying issues related to the Data Breach ("Default Time").  (*Id.* ¶ 75(d).)  Thus, all Participating Settlement Class Members will be eligible to receive cash payments in addition to the Credit Monitoring and Insurance Services.  The Default Time Payment is $20 per hour for two hours, or $40 total.  (*Id.*)

Payments may be reduced on a pro rata basis if the Settlement Fund otherwise would be depleted.  (*Id.* ¶ 81(b).)  In the event that Default Time Payments are reduced below $3 in this manner, the Net Settlement Funds for Default Time Payments will instead be used to provide additional months of Credit Monitoring and Insurance Services to all Participating Settlement Class Members.  (*Id.*)

In the event that any monies remain in the Settlement Fund more than 150 days

11

after the distribution of cash payments to the Participating Settlement Class Members, a subsequent Settlement Payment will be evenly distributed to all Participating Settlement Class Members with Approved Claims, provided that the average check amount is equal to or greater than $3. In the event that a subsequent Settlement Payment made to Participating Members would exceed $250, the Parties will make a proposal to the Court on how to disburse the remaining Net Settlement Fund. If the average check amount in a distribution would be less than $3, the remaining Net Settlement Fund will be used to extend the Credit Monitoring and Insurance Services to Participating Settlement Class Members receiving that benefit for as long as possible. Any amount remaining in the Net Settlement Fund after said extension is accomplished, would be distributed to Rose Foundation's Consumer Privacy Rights Fund, the Non-Profit Residual Recipient. (*Id.* ¶ 82.)

### 4.   Remedial Measures Attributable to the Settlement

An additional benefit of the Settlement is the remedial measures that Experian has enacted as a result of this litigation, which will benefit all Class Members regardless of whether they submit a claim. These remedial measures include, but are not limited to, numerous security enhancements to Experian's network, remediation of additional vulnerabilities, heightened encryption throughout its network and its user database, implementation of its Security First Program consisting of 82 security-related projects and hiring an additional 60 full-time employees. (*Id.* ¶ 85; *see also* Settlement Agreement Ex. F, S. Thompson Decl. ¶¶ 8-9.)

### 5.   The Settlement's Value to Settlement Class Members

The Credit Monitoring and Insurance Services to be provided to the Settlement Class have a retail value of at least $19.99 per month. (J. Thompson Decl. ¶ 7; Siciliano Decl. ¶¶ 8-9.) Given a class size of nearly 16 million individuals, this is an enormous benefit; potentially amounting to billions of dollars of savings to Settlement Class Members were they to obtain similar, or even inferior, credit monitoring products on their own. Even applying a projected claims rate of between

0.2% (*Target* and *Home Depot*) and 2% (*Anthem*), the value of this benefit is still significant. For instance, at a 0.2% claims rate (31,844 Participating Settlement Class Members), the value of the Credit Monitoring and Insurance Services claimed minus the cost to secure the Credit Monitoring and Insurance Services would be over $13.9 million,[4] and the Participating Class Members claiming Default Time would receive approximately $126.61 each.[5]  A higher response rate means more claimants will receive the Credit Monitoring and Insurance Services, resulting in an increase in the value attributable to that component of the Settlement and reducing the amount of cash paid per Class Member as the number of claimants increases.

The following table provides the expected value of the various components of the Settlement at several different response rates.  It assumes that the Court awards Plaintiffs' counsel $10.5 million in fees and expenses and a total of $142,500 in Service Awards to the 57 Class Representatives, Class Members submit valid Documented Claims totaling $250,000, and postage costs are $4,693,270.  The table accounts for the varying costs of Settlement Administration and of providing the Credit Monitoring and Insurance Services at the different response rates indicated:

| Claims Rate | No. Claimants | Assumed Total | Default Time Payments | Add'l Payment | Value of Credit Monitoring Services | Total Value of Settlement[6] |
|---|---|---|---|---|---|---|

[4] 31,844 claims $\times$ 24 months $\times$ $19.99 per month = $15,277,477.44.  The cost of providing the Credit Monitoring and Insurance Services at this claims rate under the terms negotiated by Class Counsel would be $1.3 million. (Wolfson Decl. ¶ 36; Robinson Decl. ¶ 35.)

[5] Using a claims rate of 0.2% (31,844 Participating Settlement Class Members), the amount of money remaining in the $22 million non-reversionary settlement fund after deducting for the cost of the Credit Monitoring and Insurance Services, total Documented Claims estimated at $250,000, notice and settlement administration, requested attorneys' fees and costs, and Service Awards is approximately $4,031,730.  As each Participating Settlement Class Member is entitled to a Default Time Payment of $40, under this scenario the aggregate amount of Default Time Payments would be $1,273,760 ($40 $\times$ 31,844), which would leave a remaining amount of $2,757,970 ($4,031,730 - $1,273,760).  As such, using a claims rate of 0.2%, an additional amount of $86.61 will be paid to Participating Settlement Class Members ($2,757,962 ÷ 31,844).

[6] The "Total Value" depicted here represents the value of Credit Monitoring and Insurance Services based on the given response rate (which has been reduced by

| | | Documented Claims | | | | |
|---|---|---|---|---|---|---|
| 0.2% | 31,844 | $250,000 | $40.00 | $96.48 | $13,977,477 | $47,677,477 |
| 0.4% | 63,688 | $250,000 | $40.00 | $28.24 | $29,254,955 | $62,954,955 |
| 1% | 159,221 | $250,000 | $18.32 | $0.00 | $73,887,867 | $107,587,867 |
| 2% | 318,442 | $250,000 | $7.74 | $0.00 | $150,075,733 | $183,975,734 |
| 4% | 636,884 | $250,000 | $3.72 | $0.00 | $303,051,468 | $336,751,468 |

Given the $22 million Settlement Fund, $11.7 million minimum value of remedial measures, and the additional $7,638,786.22 for every one-tenth of one percent (0.1%) of Class Members receiving Credit Monitoring and Insurance Services (without excluding the cost of Credit Monitoring and Insurance Services, which is capped at $2.5 million but varies based on response rate, and is figured into the value of Credit Monitoring Services as well as the Total Value of Settlement numbers in the table above), Plaintiffs estimate that the actual value of the Settlement Benefits provided to the Class is at least $47,677,477.44, assuming a conservative 0.2% claims rate.[7]  (Wolfson Decl. ¶ 41; Robinson Decl. ¶ 31.)

### 6.    Plan of Distribution

Subject to the Court's approval, the Settlement Fund will first be used to pay the Credit Monitoring Services, Class Counsel's attorneys' fees and reasonable Litigation Expenses, and any Court-approved Service Awards to the Class Representatives; the remainder will constitute the Net Settlement Fund. Payments for reimbursement of Out-of-Pocket Costs will be paid first from the Net Settlement

the amount of the Settlement Fund used to pay for such services), plus Defendants' remedial measures resulting from this Action, and the $22 million Settlement Fund, which is used, as explained herein, to make the cash payments to Participating Settlement Class Members, and also to pay for the attorneys' fees and costs required to achieve the Settlement, Service Awards, notice and administration expenses, and to purchase the Credit Monitoring and Insurance Services.

[7] Courts previously have based percentage-of-fund calculations for fee awards on the retail value of credit monitoring services offered in connection with data breach settlements. *See, e.g.*, *Lockwood v. Certegy Check Svcs., Inc.*, No. 07-cv-01434, Dkt. No. 101 at 9 n.4 (M.D. Fla. Sept. 3, 2008) ("Using the Representative Plaintiffs' estimates of the value of the monitoring . . . ."); *In re Michaels Stores Pin Pad Litig.*, No. 11-cv-03350, Dkt. Nos. 103 (fee motion), 107 (final approval order) (N.D. Ill. Mar. 3 & April 17, 2013) (granting fee request justified under percentage method based on retail value of credit monitoring).

Fund, and the remainder will go to payments for Documented Time and Default Time, which will be prorated as necessary. In the event that Out-of-Pocket Costs Payments deplete the Net Settlement Fund, the payments for Out-of-Pockets Costs will be reduced *pro rata* and no payments for Documented Time or Default Time would be made.  Based on the response rates in other data breach settlements featuring similar documented claim benefits, however, such a scenario is extremely unlikely.

### 7.      Notice to Class

Pursuant to Rule 23(e)(4), the Settlement Administrator will provide Class Members with the Summary Notice via U.S. Mail to each Class Member's last known U.S. Mail address and, if an email address is available, will follow up with email reminders.  (Settlement Agreement ¶¶ 89-94; Declaration of Carla A. Peak ("Peak Declaration") ¶¶ 6-23.)  The Summary Notice will contain a detachable Claim Form allowing Participating Class Members to sign up for Credit Monitoring and Insurance Services and elect to receive a payment for Default Time.

### 8.      Proposed Class Representative Service Awards

Subject to Court approval, Experian agrees not to oppose the payment of $2,500 service awards to each Plaintiff for their service as Class Representatives. (Settlement Agreement ¶ 101.)  As set forth in their declarations, attached as Exhibit 2 to the Declaration of Tina Wolfson, these Plaintiffs have been enthusiastic and active class representatives.  They investigated the matter prior to and after retaining their respective attorneys, participated in the plaintiff vetting process implemented by Class counsel, reviewed and approved their original complaints and the Consolidated Complaint, discovery, and other documents, kept in contact with counsel to monitor the progress of the litigation, and reviewed and communicated with their respective counsel and Class Counsel regarding the Settlement Agreement and its exhibits.  Each put their name and reputation on the line for the sake of the Class, and no recovery would have been possible without their critical role.  The

15

proposed $2,500 service awards are consistent with those approved in other data breach class action settlements.

### 9.     Attorneys' Fees and Costs

As part of the Settlement, Class Counsel agree not to seek an award of fees in excess of $10.5 million, and Defendants agree not to oppose such a request. (Settlement Agreement ¶ 104.)   This amount represents 22% of the minimum estimated Settlement Value ($47,677,477.44), which assumes a conservative 0.2% participation rate.  Such a request is well within an approvable range, and is below the Ninth Circuit's 25% "benchmark" percentage for such awards.  *E.g.*, *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048-50 (9th Cir. 2002); *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 949 (9th Cir. 2015); *see also Schulein v. Petroleum Dev. Corp.*, No. SACV 11-1891 AG (ANX), 2015 WL 12698312, at *6 (C.D. Cal. Mar. 16, 2015) (30% of the settlement is "certainly not unique, especially in common fund cases" and "is similar to awards in other cases, which favors granting the motion.").

Attorneys' fees were negotiated at the final mediation with Judge Gandhi only after agreement was reached on all material terms of the Settlement.  (Wolfson Decl. ¶ 32; Robinson Decl. ¶ 31.)  *See also In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 445 (3d Cir.), *as amended* (May 2, 2016) (deferring discussion of fees until after material settlement terms are agreed upon is a practice routinely approved by courts).

The Proposed Order for preliminary approval provides that Class Counsel will file a motion for payment of attorneys' fees and expenses prior to the Final Fairness Hearing.  As that motion will make clear, the $10.5 million sought is reasonable as a percentage of the fund and is also commensurate with the lodestar attorneys' fees plus expenses incurred in this matter.  Class Members will have the opportunity to comment on or object to the fee petition under Rule 23(h), consistent with Ninth Circuit authority. *See Mercury Interactive Corp. Sec. Litig. v. Mercury Interactive*

16

*Corp.*, 618 F.3d 988, 993-94 (9th Cir. 2010).

### 10. The Settlement Administrator

The Parties propose that KCC—an experienced and reputable national class action administrator—serve as Settlement Administrator to provide notice; administer and make determinations regarding claim forms; process settlement payments; make distributions; and provide other services necessary to implement the Settlement.  (Settlement Agreement ¶ 45; Peak Declaration ¶¶ 8-23.)  The costs of the Settlement Administrator will be paid out of the Settlement Fund, and KCC will cap its fees at $1,545,000, excluding the cost of postage which is estimated to be between $4,381,474 and $4,693,270. (Wolfson Decl. ¶ 34; Robinson Decl. ¶ 33.)

## IV. PRELIMINARY APPROVAL IS APPROPRIATE

### A. Legal Standards

"[I]n the context of a case in which the parties reach a settlement agreement prior to class certification, courts must peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement." *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003).

### 1. Class Certification

Parties seeking class certification for settlement purposes must satisfy the requirements of FRCP 23. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620, 117 S.Ct. 2231, 2248 (1997).  "A court considering such a request should give the Rule 23 certification factors 'undiluted, even heightened, attention in the settlement context.'" *Sandoval v. Roadlink USA Pac., Inc*., No. EDCV 10-00973 VAP, 2011 WL 5443777, at *2 (C.D. Cal. Oct. 9, 2011) (quoting *Amchem*, 521 U.S. at 621).

A party seeking class certification must first demonstrate that: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P.

23(a).  "Second, the proposed class must satisfy at least one of the three requirements listed in Rule 23(b)." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345, 131 S.Ct. 2541, 2548 (2011).

### 2.        Fairness of the Proposed Class Action Settlement

Rule 23 provides that "the claims, issues, or defenses of a certified class may be settled. . . only with the court's approval." Fed. R. Civ. P. 23(e). "The primary concern of [Rule 23(e)] is the protection of th[e] Class Members, including the named plaintiffs, whose rights may not have been given due regard by the negotiating parties." *Officers for Justice v. Civil Service Comm'n of the City & Cnty. of San Francisco*, 688 F.2d 615, 624 (9th Cir. 1982), *cert. denied*, 459 U.S. 1217 (1983). Accordingly, a district court must determine whether a proposed class action settlement is "fundamentally fair, adequate, and reasonable." *Staton*, 327 F.3d at 959; see Fed. R. Civ. Proc. 23(e). Whether to approve a class action settlement is "committed to the sound discretion of the trial judge." *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir.), *cert. denied*, *Hoffer v. City of Seattle*, 506 U.S. 953 (1992) (internal quotation marks and citation omitted).

The Court may approve a settlement agreement "after a hearing and on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).  District courts must consider various factors in assessing a settlement proposal:

- the strength of the plaintiffs' case;
- the risk, expense, complexity, and likely duration of further litigation;
- the risk of maintaining class action status throughout the trial;
- the amount offered in settlement;
- the extent of discovery completed and the stage of the proceedings;
- the experience and views of counsel;
- the presence of a governmental participant; and
- the reaction of the Class Members to the proposed settlement.

*Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575-76 (9th Cir. 2004).

18

"[I]n the context of a case in which the parties reach a settlement agreement prior to class certification, courts must peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement." *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003); *see also Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998) ("settlement approval that takes place prior to formal class certification requires a higher standard of fairness.")   As the Ninth Circuit has observed, "[p]rior to formal class certification, there is an even greater potential for a breach of fiduciary duty owed the class during settlement. Accordingly, such agreements must withstand an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e) before securing the court's approval as fair." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011).   Ultimately, "[s]trong judicial policy favors settlements." *Churchill*, 361 F.3d at 576 (ellipses and quotation marks omitted) (quoting *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992)).

Approval of a class action settlement requires a two-step process: preliminary approval followed by a later, final approval.  *See West v. Circle K Stores, Inc.*, 2006 WL 1652598, *2 (E.D. Cal. 2006) ("[A]pproval of a class action settlement takes place in two stages."); *Tijero v. Aaron Bros., Inc.*, 2013 WL 60464, *6 (N.D. Cal. 2013) ("The decision of whether to approve a proposed class action settlement entails a two-step process.").  At the preliminary approval stage, the court "evaluate[s] the terms of the settlement to determine whether they are within a range of possible judicial approval." *Wright v. Linkus Enters., Inc.*, 259 F.R.D. 468, 472 (E.D. Cal. 2009). Although "[c]loser scrutiny is reserved for the final approval hearing[,]" *Harris v. Vector Mktg. Corp.*, 2011 WL 1627973, *7 (N.D. Cal. 2011), "the showing at the preliminary approval stage—given the amount of time, money and resources involved in, for example, sending out new class notices —should be good enough for final approval." *Spann v. J.C. Penney Corp.*, 314 F.R.D. 312, 319 (C.D. Cal. 2016).

///

19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## B. Discussion

### 1. Class Certification

#### i. The Class is Sufficiently Numerous

Rule 23(a)(1) requires that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a). Joinder is usually impracticable if a class is "large in numbers." *See Jordan v. Cnty. of Los Angeles*, 669 F.2d 1311, 1319 (9th Cir.), *vacated on other grounds*, 459 U.S. 810 (1982) (class sizes of 39, 64, and 71 are sufficient to satisfy the numerosity requirement). Joinder of all 15,922,099 Settlement Class Members is impractical; numerosity is satisfied.

#### ii. There are Common Questions of Law and Fact

The commonality requirement is satisfied if "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "This does not, however, mean that every question of law or fact must be common to the class; all that Rule 23(a)(2) requires is a single significant question of law or fact." *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 957 (9th Cir. 2013), *cert. denied*, 135 S.Ct. 53 (2014) (emphasis and internal quotation marks omitted); *see Mazza v. Am. Honda Motor Co.*, 666 F.3d 581 589 (9th Cir. 2012) (characterizing commonality as a "limited burden," stating that it "only requires a single significant question of law or fact"). Proof of commonality under Rule 23(a) is "less rigorous" than the related preponderance standard under Rule 23(b)(3). See *Mazza*, 666 F.3d at 589.

Here, there are many common issues of law and fact that affect the Class uniformly and satisfy the commonality requirement, including: Experian's data security practices prior to the breach, the breach itself, whether the Experian owed a duty to the Class Members to keep PII secure, and whether it breached that duty.

#### iii. The Class Representatives' Claims are Typical of Those of Other Class Members

Rule 23(a)(3) requires that the Class Representatives' claims be typical of those of the Class. The typicality requirement of Rule 23 is satisfied if the claim of

20

the named class representative arises "from the same course of conduct that gives rise to the claims of unnamed Class Members to bring individual actions. *Thomas v. Baca*, 231 F.R.D. 397, 401 (C.D. Cal. 2005); *Hanlon*, 150 F.3d at 1020 (describing standard for typicality as permissive; claims typical if "reasonably co-extensive with those of absent Class Members" although "they need not be substantially identical."). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other Class Members have been injured by the same course of conduct." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011) (internal quotation marks and citation omitted).

Here, the claims of the named Plaintiffs are typical of the claims of the Settlement Class.  Plaintiffs' and Class Members' claims arise from the same nucleus of facts and are based on the same legal theory: that Experian's inadequate data security resulted in unauthorized parties acquiring Plaintiffs' and Class Members' PII.  Plaintiffs thus satisfy the typicality requirement of Rule 23(a)(3).

### iv.  Class Representatives and Class Counsel Adequately Represent Class Members

Rule 23(a)(4) permits certification of a class action only if "the representative parties will fairly and adequately protect the interests of the class," which requires (1) that the named Plaintiff not have conflicts of interest with the proposed Class; and (2) that the named Plaintiff be represented by qualified and competent counsel. *See In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 895 F.3d 597, 607 (9th Cir. 2018).  "Adequate representation depends on, among other factors, an absence of antagonism between representatives and absentees, and a sharing of interest between representatives and absentees." *Ellis*, 657 F.3d at 985; *see also Amchem*, 521 U.S. at 625-26 ("The adequacy inquiry under Rule 23(a) . . . serves to uncover conflicts of interest between named parties and the class they seek to represent.  A class representative must be part of the class and possess the same

21

interest and suffer the same injury as the class members.").

Plaintiffs and their counsel are adequate. First, the proposed Class Representatives do not have any conflicts of interest with the absent Class Members, as their claims are coextensive with those of the Class Members. *General Tel. Co. v. Falcon*, 457 U.S. 147, 157-58, fn. 13 (1982). They have read and understood the basic allegations of the CAC and are willing to prosecute this matter on behalf of the Class. (Wolfson Decl. Ex. 2, Class Representative Declarations.) As detailed in their declarations, the proposed Class Representatives have been consistently involved in this litigation, providing valuable insight and useful facts allowing Class Counsel to effectively litigate this action, perform discovery, and negotiate this Settlement. Further, all proposed Class Representatives were clearly advised of and understand their obligations as Class Representatives. Plaintiffs regularly communicated with Class Counsel regarding various issues pertaining to this case and will continue to do so until the Settlement is approved, and its administration completed. *Id.*

Second, proposed Class Counsel are qualified and experienced in conducting class action litigation, especially cases involving consumer protection. *See* (Wolfson Decl. ¶¶ 37-38 & Ex. 1; Robinson Decl. ¶¶ 36-37 & Ex. 1.) Proposed Class Counsel vigorously prosecuted this action and will continue to do so through final approval. Proposed Class Counsel identified and investigated the claims in this lawsuit and the underlying facts, and successfully negotiated this Settlement. (Wolfson Decl. ¶¶ 5-6, 16-36; Robinson Decl. ¶¶ 4-5, 15-35; *see also In re Emulex Corp. Sec. Litig.*, 210 F.R.D. 717, 720 (C.D. Cal. 2002) (a court evaluating adequacy of representation may examine "the attorneys' professional qualifications, skill, experience, and resources . . . [and] the attorneys' demonstrated performance in the suit itself"); *Barbosa v. Cargill Meat Sols. Corp.*, 297 F.R.D. 431, 443 (E.D. Cal. 2013) ("There is no challenge to the competency of the Class Counsel, and the Court finds that Plaintiffs are represented by experienced and competent counsel who have litigated numerous class action cases.")).

22

### v. The Settlement Class Meets the Requirements of Rule 23(b)(3) Because Common Issues of Law and Fact Predominate

In addition to the requirements of Rule 23(a), at least one of the prongs of Rule 23(b) must be satisfied. Rule 23(b)(3) allows certification of a class if the Court finds that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In the settlement context, the manageability criterion of Rule 23(b)(3)(D) does not apply. *Amchem*, 521 U.S. at 620.

"Common questions that yield common answers" and are "apt to drive the resolution of this case" predominate over any individual issues. *Dukes*, 564 U.S. at 345. Plaintiffs' claims would be resolved if the following common issues of law and fact are resolved:

- Were Experian's data security practices sufficient to protect plaintiffs' data?
- Could Experian have avoided the Data Breach of plaintiffs' PII or mitigated its effects by implementing better data security practices?
- Did Experian owe Plaintiffs a duty to protect their PII?
- Was Experian negligent in its data security practices?

The issues of duty and breach are common to all Class Members because they focus on Experian's Class-wide data security policies and practices, and will be proven with common evidence, including Experian's internal documents, testimony of its employees, and expert analysis. *See In re the Home Depot, Inc., Customer Data Sec. Breach Litig.*, No. 1:14-MD-02583-TWT, 2016 WL 6902351, at *2 (N.D. Ga. Aug. 23, 2016). The Data Breach affected all Class Members in a uniform fashion, compromising the same types of PII for each. *Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1154-55 (9th Cir. 2016); *see also Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 987-88 (9th Cir. 2015) (plaintiffs need only "show that

23

their damages stemmed from the defendant's actions that created the legal liability").

Although the extent of plaintiffs' damages may vary, variations in damages do not preclude certification. *Id.* Nor do choice of law considerations preclude certification of a nationwide class. Under California's choice of law rules, the class action proponent bears the initial burden to show that California has "significant contact or significant aggregation of contacts" to the claims of each class member. *Wash. Mut. Bank v. Super. Ct.*, 24 Cal. 4th 906, 921 (Cal. 2001) (citations omitted). Such a showing is necessary to ensure that application of California law is constitutional. *See Allstate Ins. Co. v. Hauge*, 449 U.S. 302, 310-11 (1981).

Once the class action proponent makes this showing, the burden shifts to the other side to demonstrate "that foreign law, rather than California law, should apply to class claims." *Wash. Mut. Bank*, 24 Cal. 4th at 921. California law may apply on a Class-wide basis if "the interests of other states are not found to outweigh California's interest in having its law applied." *Id.* (citations omitted). To determine whether the interests of other states outweigh California's interests, courts ask whether the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or different. If the answer is yes, no further inquiry is required. *McCann v. Foster Wheeler LLC*, 48 Cal. 4th 68, 81-82 (2010).

Here, no one before the Court advocates that foreign law should apply. But even if there were, California law applies because there are no significant variations among states in negligence common law. To prove their claim for negligence, Plaintiffs must show that 1) Experian owed Class Members a duty, 2) Experian breached that duty, 3) Experian's breach injured Class Members, and 4) Class Members' damages were caused by the injury resulting from Experian's breach of duty. *Corona v. Sony Pictures Entm't, Inc.*, No. 14-CV-09600 RGK EX, 2015 WL 3916744, at *3 (C.D. Cal. June 15, 2015). These elements of negligence vary little, if any, among states, as the Court reasoned when ruling on Defendants' motion to

24

dismiss. *See* Dec. 29, 2016 Order Granting In Part and Denying In Part Defendants' Motion to Dismiss (Dkt. 213) (denying Defendants' motion to dismiss negligence claims under New York, Illinois, Ohio, and California, and holding the economic loss doctrine does not preclude these claims); *see also In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liability Litig.*, 978 F. Supp. 2d 1053, 1100 (C.D. Cal. 2013) (citation omitted) (elements of negligence are "almost universally . . . the existence of a legal duty; breach of that duty; a causal connection between the defendant's conduct and the plaintiff's injury; and damages."). Thus, whether the Court applies California law nationwide, or respective state's laws, common issues predominate.[8]

Finally, if the proposed Settlement Agreement is approved, there will be no need for a trial, and thus manageability of the classes for trial is irrelevant. *Amchem*, 521 U.S. at 620. A class settlement is superior to other methods of litigation where, as here, class treatment will promote greater efficiency and no realistic alternative exists. *See Local Joint Exec. Bd. Of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1163 (9th Cir. 2001); *Otsuka v. Polo Ralph Lauren Corp.*, 251 F.R.D. 439, 448 (N.D. Cal. 2008).

## 2. The Proposed Settlement Should be Preliminarily Approved

### i. The Strength of Plaintiffs' Case

Plaintiffs are confident that they would succeed if this case proceeded to trial. However, given the heavy obstacles and inherent risks Plaintiffs face with respect to the novel claims in data breach class actions, including, class certification, summary

---

[8] Consideration of *In re Hyundai & Kia Fuel Economy Litigation,* 881 F.3d 679 (9th Cir. 2018) does not change this analysis. First, the Ninth Circuit has recently heard that decision *en banc*—the Court heard oral argument on September 27, 2018. Currently, the decision is unpublished. However, even if the *en banc* panel affirmed the decision, certification here would nonetheless be proper under the above analysis.

judgment, and trial, the substantial benefits the Settlement provides favors preliminary approval of the Settlement.

### ii. The Risk, Expense, Complexity, and Likely Duration of Further Litigation

This factor overwhelmingly weighs in favor of preliminary approval of the Settlement. The risk, expense, complexity, and likely duration of further litigation in this Action is substantial.

Data breach cases, such as this one, are especially risky, expensive, and complex. There are numerous hurdles that Plaintiffs must overcome before the Court would find that a trial is appropriate, including class certification and summary judgment. In addition, establishing a cognizable injury tied to Defendants' conduct (as opposed to, for instance, another data breach), can present challenges. *See, e.g.*, *Krottner v. Starbucks Corp.*, 406 F.App'x 129 (9th Cir. 2010) (holding that, although plaintiffs established injury-in-fact for standing purposes, they failed adequately to allege damages for purposes of their negligence claim). Were the case to proceed in litigation, there would be numerous expert reports and costly depositions. Plaintiffs might be forced to establish liability without the benefit of Experian's own forensic report, and it is far from certain that the Court would approve Plaintiffs' damages theory and certify the Class. Conversely, given that all Class Members will be eligible to receive Credit Monitoring and Insurance Services, as well as cash payments, the Settlement compensates them for the types of damages they suffered without the substantial risk of continued litigation. Therefore, this factor strongly supports preliminary approval of the Settlement.

### iii. The Risk of Maintaining Class Action Status Throughout the Trial

Class certification has not yet been granted in this Action. Although Plaintiffs prepared and shared with Experian a draft of their class certification motion, there is little authority relating to data breaches that Plaintiffs can rely on to determine how

the Court would rule on their motion.  This makes the risk of Plaintiffs obtaining class certification great.  Data breach law is continuously developing so that, even if Plaintiffs obtained class certification, there is no guarantee that the class action status would be maintained.  Defendants would likely appeal any decision by the Court, resulting in additional delay to Class Members. Moreover, the Court could decide to certify the Class for liability purposes but require Class Members to prove their respective damages individually, likely requiring individual trials for each Class Member to receive a benefit.  *See, e.g.*, *Smith v. Triad of Alabama, LLC*, No. 1:14-CV-324-WKW, 2017 WL 1044692, (M.D. Ala. Mar. 17, 2017), *on reconsideration in part*, 2017 WL 3816722 (M.D. Ala. Aug. 31, 2017) (adopting this bifurcated approach). The significant risk of obtaining and maintaining class certification in this case supports preliminary approval.

### iv.  The Amount Offered in Settlement

The $22 million non-reversionary Settlement Fund is an excellent result for the Class.  With this fund, all Class Members will be eligible for a monetary payment in addition to top-tier Credit Monitoring and Insurance Services, conservatively valued at $13.98 million, assuming a 0.2% claims rate.  Further, the remedial measures obtained as a result of this litigation, deliver additional benefits of $11.7 million to the Class.  (Settlement Ex. F, S. Thompson Decl. ¶¶ 8-9.)

The Settlement is in line with or superior to other recent data breach settlements:

- *In re Anthem, Inc. Data Breach Litigation*, No. 5:15-MD-02617-LHK (N.D. Cal. 2017): $110 million settlement fund, which included $37.95 million in attorney fees (reduced to $31.05 million), for 78.8 million *Anthem* insureds who had their social security numbers and health data acquired by unauthorized parties.  Although class members were eligible for similar benefits as here, only those who did not elect the credit monitoring services (and did not submit a documented expense and time claim) were eligible for

27

alternative cash payments.  By contrast, all Settlement Class Members here are eligible for both Credit Monitoring and Insurance Services *and* one of the two types of cash payments.

- *In re The Home Depot, Inc. Customer Data Security Breach Litigation*, No. 1:14-md-02583-TWT (N.D. Ga. 2016): $13 million settlement fund, an additional $6.5 million (paid out of the settlement fund if funds remained after claims) for credit monitoring services, and $7.5 million in attorney fees for a class of over 40 million Home Depot consumers who had their payment data acquired by unauthorized parties.

- *In re Target Corp. Customer Data Security Breach Litigation*, No. 0:14-md-02522-PAM (D. Minn. 2015): $10 million settlement fund and $6.75 million in attorney fees for up to 110 million Target consumers who had their payment data acquired by unauthorized parties.

The Settlement before the Court should take its place among the settlements cited above as an excellent result for the Class.  Thus, this factor strongly supports preliminary approval of the Settlement.

### v. The Extent of Discovery Completed and the Stage of the Proceedings

This matter has been intensely litigated.  The Settlement was reached near the end of the discovery period.  Plaintiffs deposed many of Experian's current and former employees, reviewed many documents, and conducted an immense amount of research and investigation into the Data Breach along with their experts.  Similarly, class representatives provided verified responses to extensive discovery served by Experian.  Plaintiffs obtained sufficient information through discovery to make an informed decision regarding Settlement.

In addition, several motions were filed with the Court, including Defendants' motions to dismiss the complaint and Plaintiffs' motion to compel the third-party forensic report.  Plaintiffs conducted extensive research and drafted a motion for class

28

certification.  As a result, Plaintiffs are well aware of the risks involved if they were to proceed with class certification and trial. Given the advanced stage of these proceedings, Class Counsel have a clear view of the strengths and weaknesses of the case and to recommend that the Court grant preliminary approval to the Settlement. (Wolfson Decl. ¶¶ 39-41; Robinson Decl. ¶ 38-40.)

### vi.  The Experience and Views of Counsel

Class Counsel include attorneys who have substantial experience serving as counsel in numerous complex actions, including in other data breach cases. (Wolfson Decl. ¶¶ 37-38 & Ex. 1; Robinson Decl. ¶¶ 36-37, Ex 1.) They fully endorse the Settlement as fair, reasonable, and adequate to the Class.  (Wolfson Decl. ¶ 39; Robinson Decl. ¶ 38.)

### vii.  The Presence of a Governmental Participant

No governmental agency is involved in this litigation, but the Attorney General of the United States and Attorneys General of each State will be notified of the proposed Settlement pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715, and will have an opportunity to raise any concerns or objections.

### viii.  The Reaction of the Class Members to the Proposed Settlement

The Class has yet to be notified of the Settlement and given an opportunity to object, so it is premature to assess this factor. Before the final approval hearing, the Court will receive and be able to review all objections or other comments received from Class Members, along with a full accounting of all opt-out requests.

### 3.  The Settlement was the Product of Arm's-Length Negotiations

In addition to the above factors, the Court must also be satisfied that "the settlement is not the product of collusion among the negotiating parties." *In re Bluetooth Headset*, 654 F.3d at 946-47.  Plaintiffs achieved the Settlement after nearly two years of hard fought, contested litigation and through arm's-length

negotiations.  Defendants filed a motion to dismiss, the parties engaged in significant two-way discovery, including the production of hundreds of thousands of pages of documents, oral and written discovery, and the parties sought court intervention regarding several discovery issues.  Plaintiffs also undertook substantial investigation, including seeking guidance from experts to further understand the technical aspects of the Data Breach.  In February 2017, the parties agreed to private mediation.  When negotiations began, Plaintiffs had a clear view of the strengths and weaknesses of their case and were in a strong position to make an informed decision regarding the reasonableness of a potential settlement.  The parties engaged in extensive arm's length negotiations, including two mediation sessions with retired judges, and finally reached an agreement in principal after a full day Settlement Conference with the Honorable Jay C. Gandhi (now retired) on January 26, 2018. Since then, the Parties drafted, negotiated, and exchanged many revisions of the Settlement Agreement and related exhibits in the process of negotiating the best deal for the class with respect to class action notice and administration services, as well as the Credit Monitoring and Insurance services.

Plaintiffs began to negotiate attorney fees only after the parties reached an agreement on all other terms of the Settlement at the mediation with Judge Gandhi. Plaintiffs' counsel will be paid from the same non-reversionary Settlement Fund as Class Members, such that Plaintiffs' counsel had every incentive to secure the largest fund possible.  There is no indication of collusion or fraud in the settlement negotiations, and none exists.

### 4.     The Proposed Notice is Appropriate

"The court must direct notice in a reasonable manner to all Class Members who would be bound by the proposal."  Fed. R. Civ. P. 23(e)(1).  Federal Rule of Civil Procedure 23(c)(2) requires the Court to "direct to Class Members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort," although actual notice is

30

not required. *Amchem Prods., Inc.*, 521 U.S. at 617; *Reppert v. Marvin Lumber & Cedar Co*., 359 F.3d 53, 56 (1st Cir. 2004); *Silber v. Mabon*, 18 F.3d 1449, 1454 (9th Cir. 1994).  "The standard for the adequacy of a settlement notice in a class action under either the Due Process Clause or the Federal Rules is measured by reasonableness." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 113 (2d Cir.), *cert. denied*, 544 U.S. 1044 (2005).  The best practicable notice is that which is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to object." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950); *see Trotsky v. Los Angeles Fed. Sav. & Loan Ass'n.*, 48 Cal.App.3d 134, 151-52 (1975) (same); *Wershba v. Apple Comput., Inc.*, 91 Cal.App.4th 224, 252 (2001) ("As a general rule, class notice must strike a balance between thoroughness and the need to avoid unduly complicating the content of the notice and confusing Class Members.").  The notice should provide sufficient information to allow Class Members to decide whether they should accept the benefits of the settlement, opt out and pursue their own remedies, or object to its terms.  *See Wershba*, 91 Cal.App.4th at 251-52. "[N]otice is adequate if it may be understood by the average class member." *Warner v. Toyota Motor Sales, U.S.A., Inc.*, No. CV152171FMOFFMX, 2016 WL 8578913, at *14 (C.D. Cal. Dec. 2, 2016) (quoting 4 Newberg on Class Actions § 11:53, at p. 167 (4th ed. 2013)).

Subject to Court approval, the parties have selected KCC as the Settlement Administrator.  The notice program agreed to by the parties and approved by KCC includes direct mailing via U.S. mail to all Settlement Class Members, and reminder emails to those for whom email addresses are available.  This represents the best notice practicable, and less extensive notice has been approved by courts in this Circuit.  *Noll v. eBay, Inc.*, 309 F.R.D. 593, 605 (N.D. Cal. 2015); *Stone v. Howard Johnson Int'l, Inc.*, No. 12-CV-01684 PSG (MANX), 2015 WL 13648551, at *2 (C.D. Cal. June 15, 2015); *Abat v. Chase Bank USA, N.A.*, No. SACV 0701476-CJC (ANx), 2011 WL 13130637, at *6 (C.D. Cal. July 11, 2011).

31

The Long Form Notice is clear, precise, informative, and meets all of the necessary standards. It includes information such as the case caption; a description of the Class; a description of the claims and the history of the litigation; a description of the Settlement and the claims being released; the names of Class Counsel; a statement of the maximum amount of attorneys' fees that will be sought by Class Counsel; the amount Class Counsel will seek for incentive awards; the Fairness Hearing date; a description of Class Members' opportunity to appear at the hearing; a statement of the procedures and deadlines for requesting exclusion and filing objections to the Settlement; and the manner in which to obtain further information. *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 496 (D.N.J. 1997), *aff'd*, 148 F.3d 283 (3d Cir. 1998); s*ee also* MANUAL FOR COMPLEX LITIGATION § 30.212 (4th ed. 2004) (Rule 23(e) notice designed to be a summary of the litigation and settlement to apprise class members of the right and opportunity to inspect the complete settlement documents, papers, and pleadings).

The notice program was reviewed and analyzed to ensure it meets the requisite due process requirements. (Peak Decl. ¶¶ 5-14.) Indeed, the program here is consistent with, and exceeds, other similar court-approved notice plans, the requirements of FRCP 23(c)(2)(B), and the Federal Judicial Center ("FJC") guidelines for adequate notice.  As there is no alternative method of notice that would be practicable here or more likely to notify Class Members, the proposed procedure for providing notice and the content of the Class Notice constitute the best practicable notice to Class Members and complies with the requirements of due process.

### 5.    The Claim Process Is Easy and not Cumbersome

The Claim process is straightforward and employs a tear-off postcard that Class Members can return to receive Credit Monitoring and Insurance Services and a Default Time Payment.  The same postcard notice will also inform Class Members how they can submit a claim for reimbursement of Out-of-Pocket Costs and Documented Time Payments, and will direct recipients to the Settlement Website,

where they can submit claims, view the Long Form Notice, and review the Settlement Agreement and other filings.

**6.     The Court Should Set Settlement Deadlines and Schedule a Fairness Hearing**

In connection with preliminary approval, the Court must set a final approval hearing date, dates for mailing the Notices, and deadlines for objecting to the Settlement and filing papers in support of the Settlement.  Plaintiffs propose the following schedule, which the parties believe will provide ample time and opportunity for Class Members to decide whether to request exclusion or object.

| EVENT | DATE |
|---|---|
| Notice Postmarked and Mailed | Within **28 Days** from the Preliminary Approval Order |
| Deadline to Submit Claim Forms | **90 Days** from the Notice Date |
| Deadline to Submit Motion for Attorneys' Fees, Costs and Incentive Awards | At Least **21 Days** Before the Objection Deadline |
| Deadline to Object and Comment to the Settlement | **75 Days** from the Notice Date |
| Deadline to Submit Request for Exclusion | **75 Days** from the Notice Date |
| Final Fairness Hearing | To be Decided |

**V.     CONCLUSION**

Plaintiffs respectfully request that the Motion be granted and the Court enter an order: (1) certifying the proposed class for settlement; (2) preliminarily approving the proposed class action settlement; (3) appointing class representatives and class counsel; (4) appointing the notice and settlement administrator; (5) approving the class notice and related settlement administration documents; and (6) approving the proposed class settlement administrative deadlines and procedures,

///

including the proposed final fairness hearing date and procedures regarding objections, exclusions and submitting Claim Forms.

Dated: November 12, 2018

**AHDOOT & WOLFSON**

By: */s/ Tina Wolfson*
     Tina Wolfson

*Interim Co-Lead Counsel for the Class*

Sherrie Savett, Esq.
**BERGER & MONTAGUE PC**
1622 Locust Street
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604
ssavett@bm.net

Cari Campen Laufenberg, Esq.
**KELLER ROHRBACK, LLP**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Tel: (206) 623-1900
Fax: (206) 623-3384
claufenberg@kellerrohrback.com

Joseph N. Kravec, Jr., Esq.
**FEINSTEIN, DOYLE, PAYNE & KRAVEC, LLC**
Law & Finance Building, 13th Floor
429 Fourth Avenue
Pittsburgh, PA 15219
Tel: (412) 281-8400
Fax: (412) 281-1007
jkravec@fdpklaw.com

*Plaintiffs' Steering Committee*

**ROBINSON CALCAGNIE, INC.**

By: */s/ Daniel S. Robinson*
     Daniel S. Robinson

Daniel C. Girard, Esq.
**GIRARD SHARP LLP**
601 California Street, 14th Floor
San Francisco, CA 94108
Tel: (415) 981-4800
Fax: (415) 981-4846
dgirard@girardsharp.com

Christopher P. Ridout, Esq.
**ZIMMERMAN REED, LLP**
2381 Rosecrans Avenue, Suite 328
Manhattan Beach, CA 90245
Tel: (877) 500-8780
Fax: (877) 500-8781
christopher.ridout@zimmreed.com

Andrew P. Bell, Esq.
**LOCKS LAW FIRM**
801 N. Kings Highway
Cherry Hill, NJ 08034
Tel: (856) 663-8200
Fax: (856) 661-8400
abell@lockslaw.com

MEMORANDUM OF POINTS AND AUTHORITIES ISO PRELIMINARY APPROVAL

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CERTIFICATE OF SERVICE**

I hereby certify that on November 12, 2018, I caused to be filed the foregoing document. This document is being filed electronically using the Court's electronic case filing (ECF) system, which will automatically send a notice of electronic filing to the email addresses of all counsel of record.

Dated: November 12, 2018          */s/ Daniel S. Robinson*
                                    Daniel S. Robinson

MEMORANDUM OF POINTS AND AUTHORITIES ISO PRELIMINARY APPROVAL