Tina Wolfson, CA Bar No. 174806
twolfson@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
10728 Lindbrook Dr.
Los Angeles, CA 90024
Telephone: (310) 474-9111
Fax: (310) 474-8585

Daniel S. Robinson, CA Bar No. 244245
drobinson@robinsonfirm.com
Wesley K. Polischuk, CA Bar No. 254121
wpolischuk@robinsonfirm.com
**ROBINSON CALCAGNIE, INC.**
19 Corporate Plaza Dr.
Newport Beach, CA 92660
Telephone: (949) 720-1288
Fax: (949) 720-1292

*Class Counsel*
[Additional Counsel Below Signatures]

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| **IN RE EXPERIAN DATA BREACH LITIGATION** | Case No. 8:15-cv-01592 AG (DFMx) |
| | Hon. Andrew J. Guilford |
| | **NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT** |
| | Date:  May 6, 2019<br>Time:  10:00 a.m.<br>Room:  Court 10D |
| | [Filed Concurrently with Memorandum, Declarations of Tina Wolfson, Daniel Robinson, Carla Peak, and Supplemental Declaration of Lana Lucchesi] |

1

# NOTICE OF MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

**PLEASE TAKE NOTICE** that, on May 6, 2019, at 10:00 a.m., in Courtroom 10D of the United States District Judge for the Central District of California, located at 411 West 4th Street, Room 1053 Santa Ana, CA 92701, before the Honorable Andrew J. Guilford, presiding, Plaintiffs[1] will and hereby do move the Court, in accordance with Federal Rule of Civil Procedure 23, for an Order to be issued on or after May 9, 2019 (90 days following Experian's issuance of CAFA Notice as required under 28 U.S.C. § 1715) that would:

      a.      Approve the proposed Settlement Agreement (Dkt. 285) as fair, reasonable, and adequate to Plaintiffs and other Class Members, and directing the Settlement Agreement's consummation according to its terms;

      b.      Find that the form and manner of class notice implemented in accordance with the Settlement Agreement: (i) constitutes reasonable and the best practicable notice; (ii) constitutes notice reasonably calculated, under the circumstances, to apprise Class Members of the pendency of the litigation, the terms of the proposed Settlement Agreement, the right to object to the proposed Settlement Agreement or exclude themselves from the Class, and the right to appear at the Final Fairness Hearing; (iii) constitutes due, adequate, and sufficient notice to all persons entitled to receive notice; and (iv) meets the requirements of state and federal due process, the Federal Rules of Civil Procedure, and any other applicable state and/or

---

[1] Plaintiffs Stephen Allen, Richard Parks, Ryan Hamre, Joshua Gonzales, Gwendolyn Crump, Elleen Brazzle, Melissa Merry, Francisco Ojeda, Nora Bohannon, Gregary and Kashia Johnson, David Ciano, Bradford Daghita, Alison Cochran, Alice Dunscomb, Samantha Manganaris, Veronica Gillotte, David Brown, Stuart Zimmelman, Chris Shearer, Christiaan Mealey, Gregory Hertik, Allan Sommercorn, Kamil Kuklinski, Charles Yoo, Sergey Barbashov, Kathleen Alcorn, Mary Roberts, Tony George, Ryan Heitz, Gerardus Jansen, Lorenzo Jackson, Eban Liebig, Angelia Fennern, Charles Sallade, Cregan Smith, Giovanni Williams, Dipak Bhuta, Joseph Zubrzycki, Lucio Hernandez, Shivan Bassaw, Jennifer Looney, Darius Clark, Hunter Graham, Philip Popiel, John Reiser, Jennifer Brandabur, Perry Heath, David Lumb, Martha Cebrian-Vega, Mark and Daisy Hodson, Amjed Ababseh, Martha Schroeder, Jason Shafer, Nathanial Apan, Jeffrey Gutschmidt are collectively referred to as "Plaintiffs" or "Class Representatives."

federal laws;

    c.  Certify the Settlement Class for settlement purposes;

    d.  Find that all Class Members shall be bound by the Settlement Agreement, including its release provisions except for those who have a submitted a valid opt-out request;

    e.  Direct that judgment be entered dismissing with prejudice all individual and class claims asserted in the litigation and ruling that no costs or fees be assessed on either party other than as expressly provided in the Settlement Agreement and awarded by the Court in ruling upon Plaintiffs' Motion for an Award of Attorneys' Fees and Expenses (Dkt. 296);

    f.  Incorporate the release and related provisions set forth in the Settlement Agreement and barring any Released Claims against the released parties;

    g.  Approve payment of the benefits to the Class Members consistent with the Settlement Agreement; and

    h.  Retain jurisdiction of all matters relating to the interpretation, administration, implementation, and enforcement of the Settlement Agreement.

  As discussed in the accompanying memorandum, approval of the Settlement Agreement and the related relief requested herein is appropriate under applicable law and well justified under the circumstances of this matter.

///

///

///

///

///

///

///

///

///

1
2
3
4
5
6
7
8

This motion is based on this notice of motion and motion; the accompanying memorandum of points and authorities; the Settlement Agreement, including all exhibits thereto and all papers filed in support thereof; the accompanying declarations of Tina Wolfson ("Wolfson Decl."), Daniel S. Robinson ("Robinson Decl."), Carla Peak ("Peak Decl."), and Lana Lucchesi ("Lucchesi Supp. Decl."); the argument of counsel; all papers and records on file in these cases; and such other matters as the Court may consider.

9

Dated: April 8, 2019

10
11

**AHDOOT & WOLFSON**

**ROBINSON CALCAGNIE, INC.**

12
13

By: */s/ Tina Wolfson*
    Tina Wolfson

By: */s/ Daniel S. Robinson*
    Daniel S. Robinson

14

*Class Counsel*

15

[Additional Counsel Follow Memorandum of Points and Authorities]

16
17
18
19
20
21
22
23
24
25
26
27
28

MOTION FOR FINAL APPROVAL

1
2
3
4

# **TABLE OF CONTENTS**

I.      INTRODUCTION ..................................................................................1

II.     BACKGROUND ....................................................................................2

    A. The Data Breach, Commencement of Litigation, and Plaintiffs' Self-Organization.........................................................................................2

    B. Class Representative Vetting ................................................................3

    C. The Pleadings.......................................................................................4

    D. Discovery .............................................................................................5

    E. Settlement Negotiations.......................................................................7

    F. Settlement Administration ...................................................................8

III.    TERMS OF THE SETTLEMENT .........................................................9

    A. The Class Definition ............................................................................9

    B. The Settlement Benefits.......................................................................9

        1. Credit Monitoring and Insurance Services ....................................9

        2. Cash Payment for Reimbursement of Out-of-Pocket Costs ..........10

        3. Cash Payment for Documented Time or Default Time .................11

        4. Remedial Measures Attributable to the Settlement ......................12

        5. The Value of the Settlement Exceeds $150 Million .....................12

            a. The Value of the Credit Monitoring and Insurance Services Exceeds $130 Million to Date .................................................13

            b. The $11.7 Million Value Ascribed to Experian's Remedial Measures Is a Conservative Measure .......................................14

        6. Attorneys' Fees, Costs, and Service Awards................................15

            a. Attorneys' Fees and Expenses.................................................16

            b. Service Awards .......................................................................16

IV.     THE REACTION OF THE CLASS TO THE SETTLEMENT HAS BEEN OVERWHELMINGLY POSITIVE.........................................17

    A. The Claims Rate Is Approximately 3% to Date .................................17

    B. The Six Objections to the Settlement Should Be Overruled ..............18

        1. The Two Objectors Who Exclude Themselves from the Settlement Lack Standing............................................................18

        2. Objectors Harrell and Sun Do Not Take Issue with the Settlement Itself..........................................................................19

        3. The Jacobshagen Objection Lacks Merit.....................................19

        4. The Scheffler Objection Lacks Merit ...........................................19

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

V.    FINAL APPROVAL IS APPROPRIATE ..........................................22
      A. Legal Standards...................................................................22
      B. The Court Should Finally Approve the Settlement ...........................22
            1.  The Strength of Plaintiffs' Case ...................................24
            2.  The Risk, Expense, Complexity, and Likely Duration of Further Litigation ...............................................................24
            3.  The Risk of Maintaining Class Action Status Throughout the Trial ............................................................................25
            4.  The Amount Offered in Settlement ...............................26
            5.  The Extent of Discovery Completed and the Stage of the Proceedings.........................................................................27
            6.  The Experience and Views of Counsel...........................27
            7.  The Presence of a Governmental Participant ................28
            8.  The Reaction of the Class Members to the Proposed Settlement..28
            9.  Class Certification Remains Appropriate .....................29
VI.   CONCLUSION...............................................................................30

1

## **TABLE OF AUTHORITIES**

2

### **Cases**

*Adoma v. Univ. of Phoenix, Inc.*, 913 F.Supp.2d. 964 (E.D. Cal. 2012) ................24

*Chambers v. Whirlpool Corp.,* No. CV11-1733, 2016 WL 5922456
(C.D. Cal. 2016) ....................................................................25, 26, 28, 29

*Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566 (9th Cir. 2004)............18, 22, 23

*Class Plaintiffs v. City of Seattle*, 955 F.2d 1268 (9th Cir. 1992)...........................22

*Dupler v. Costco Wholesale Corp.*, 705 F. Supp. 2d 231 (E.D.N.Y. 2010) ...........18

*Garner v. State Farm Mut. Auto. Ins. Co.*, No. 08-1365, 2010 WL 1687832
(N.D. Cal. Apr. 22, 2010)..........................................................................18

*Hanlon v. Chrysler Corp.,* 150 F.3d 1011 (9th Cir. 1998)................................19, 23

*In re Anthem, Inc. Data Breach Litig.*, No. 15-MD-02617-LHK, 2018 WL
3960068 (N.D. Cal. Aug. 17, 2018) ............................................................17

*In re Anthem, Inc. Data Breach Litigation*, No. 5:15-MD-02617-LHK
(N.D. Cal.) ...........................................................................................13, 22

*In re Austrian & Ger. Bank Holocaust Litig.,* 80 F. Supp. 2d 164
(S.D.N.Y. 2000).........................................................................................25

*In re Bluetooth Headset Prod. Liab. Litig*, 654 F.3d 935 (9th Cir. 2011) ..............23

*In re Checking Account Overdraft Litig.*, No. 1:09-MD-02036-JLK, 2013 WL
11319243 (S.D. Fl. Aug. 2, 2013) .......................................................15

*In re Mego Fin. Corp. Secs. Litig.*, 213 F.3d 454 (9th Cir. 2000) ..........................27

*In re Michaels Stores Pin Pad Litig.*, No. 11-cv-03350, (N.D. Ill. 2013)...............14

*In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410
(3d Cir. 2016) ..............................................................................................16

*In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036 (N.D. Cal. 2008)..................18

*In re Syncor ERISA Litigation*, 516 F.3d 1095 (9th Cir. 2008) ..............................22

*In re Target Corp. Customer Data Security Breach Litigation*, No.
0:14-md-02522-PAM (D. Minn. 2015) ..................................................13

*In re The Home Depot, Inc. Customer Data Security Breach Litigation*,
No. 1:14-md-02583-TWT (N.D. Ga. 2016) ...........................................13

*In re The Home Depot, Inc., Customer Data Sec. Breach Litig.*, No.:
1:14-md-02583-TWT, 2016 WL 6902351 (N.D. Ga. Aug. 23, 2016) ...............13

*Johansson-Dohrmann v. Cbr Sys., Inc.*, No. 12-cv-1115-MMA (BGS), 2013 WL
3864341 (S.D. Cal. July 24, 2013) ......................................................13

vi

*Krottner v. Starbucks Corp.*, 406 F.App'x 129 (9th Cir. 2010) ..............................25

*Linney v. Cellular Alaska P'ship*, 151 F.3d 1234 (9th Cir. 1998) ...........................26

*Lockwood v. Certegy Check Servs., Inc.,* No. 07-cv-01434, Dkt. 101
    (M.D. Fla. Sept. 3, 2008) ..................................................................................13

*McCoy v. Health Net, Inc.*, 569 F. Supp. 2d 448 (D.N.J. 2008) .............................15

*Mercury Interactive Corp. Sec. Litig. v. Mercury Interactive Corp.*, 618 F.3d
    988 (9th Cir. 2010) ...........................................................................................16

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.,* 221 F.R.D. 523
    (C.D. Cal. 2004) ..................................................................................25, 28, 29

*Rodriguez v. W. Publ'g Corp.,* 563 F.3d 948 (9th Cir. 2009) ...............................28

*Shames v. Hertz Corp.*, No. 07-CV-2174-MMA WMC, 2012 WL 5392159
    (S.D. Cal. Nov. 5, 2012) ...................................................................................24

*Smith v. Triad of Alabama, LLC,* No. 1:14-CV-324-WKW, 2017 WL 1044692,
    (M.D. Ala. Mar. 17, 2017)..................................................................................26

*Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003)..........................................15, 23

*Vizcaino v. Microsoft Corp.*, 290 F.3d 1043 (9th Cir. 2002) ..................................16

**Statutes**

28 U.S.C. § 1715 ........................................................................................................28

**Other Authorities**

*USAO Attorney's Fees Matrix — 2015-2019* .........................................................22

**Rules**

Fed. R. Civ. P. 23 .........................................................................................................2

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.  INTRODUCTION

The Court preliminarily approved the proposed class action settlement ("Settlement") of this action, and the Settlement Administrator has disseminated notice to Class Members in accordance with the Settlement's Notice Plan.[2]  Now, Plaintiffs respectfully request that the Court conduct a final review of the Settlement and approve it as fair, reasonable, and adequate.

After over two years of hard-fought litigation, the Parties reached an exceptional Settlement that compensates Class Members for their losses and protects them against future risks caused by the Data Breach.  Based on current claims numbers, the Settlement value will be well over $150 million by any measure, and far beyond other similar data breach settlements.  Its value should continue to rise before the April 11, 2019 Claims Deadline.

Each Class Member is eligible to receive both Credit Monitoring and Insurance Services and one of two types of cash payments, in addition to reimbursement of any Out-of-Pocket Costs.  The $22 million Settlement Fund will be used to provide: (1) two years of an enhanced version of Identity Guard's Individual Total Plan to any Class Member who submits a valid claim, (2) cash payments to Class Members who submit valid claims for Out-of-Pocket Costs and Documented Time spent due to the Data Breach, and (3) cash payments of up to $40 to Class Members who submit valid claims but do not receive a payment for Documented Time.  The Settlement Fund also will be used to pay for class notice, settlement administration, Service Awards for the Class Representatives, and attorneys' fees and costs, subject to Court approval.

The Settlement provides for a robust, multi-pronged notice program and user-friendly Claims process, which have been, and are being, implemented by the Settlement Administrator.  The Court-approved notice program provided for notice

---

[2] Capitalized terms have the meaning ascribed to them in the Settlement Agreement.

by U.S. mail, followed by email reminders, in addition to the creation of a Settlement Website.  (Declaration of Carla A. Peak ("Peak Decl.") ¶¶ 5-12.)  Ultimately, the Settlement Administrator mailed postcard notices to 14.9 million Class Members' last known and updated addresses.  (*Id.* ¶¶ 4-8.)  The Settlement Administrator reasonably opines that the notice reached over 85% of the Class.  (*Id.*)  In addition, the Settlement Administrator sent reminder email notices to some 2.7 million Class Members, all of which resulted in a strong claim rate.  (*Id.* ¶ 8.)

Although the Claims Deadline will not pass until April 11, 2019, the reaction from Class Members to date has been overwhelmingly positive, and strongly supports final approval.  By submitting claim forms, some 478,970 Class Members have affirmatively voted "yes" to this Settlement, while only 519 have opted out, and six have objected.

The Settlement provides meaningful and direct relief in the form of years of Credit Monitoring and Insurance Services, the opportunity to submit claims for Out-of-Pocket Costs and loss of time attributable to the Data Breach, and enhanced protection of Class Members' personally identifiable information ("PII").  In light of the valuable benefits conveyed to members of the Settlement Class, and the significant risks faced through continued litigation, the Settlement is "fair, reasonable, and adequate," and merits final approval.  Fed. R. Civ. P. 23(e)(2).

## II.  BACKGROUND

### A.    The Data Breach, Commencement of Litigation, and Plaintiffs' Self-Organization

On October 1, 2015, Experian announced that it "experienced an unauthorized acquisition of information from a server" that held the personal information of more than 15 million consumers in the United States, including those "who applied for T-Mobile USA postpaid services or device financing from September 1, 2013 through September 16, 2015."  The PII included the names, addresses, Social Security numbers, dates of birth, identification numbers (*e.g.* driver's license numbers,

2

military ID numbers, or passport numbers), and other personally identifiable information. Following Experian's announcement, over 40 complaints related to the Data Breach were filed against Experian across the country, the first of which, *Bhuta v. Experian Information Solutions, Inc.*, No. 8:15-cv-1592 (filed October 2, 2015), was assigned to this Court. After MDL proceedings were instituted (MDL No. 2676), all plaintiffs' counsel voluntarily transferred their cases to this Court and the MDL was deemed moot. The Court consolidated the cases on December 16, 2015. (Dkt. 60.)

After transfer, Tina Wolfson of Ahdoot & Wolfson, PC and Daniel S. Robinson of Robinson Calcagnie, Inc. engaged in further meet-and-confer efforts to agree on a leadership structure so that Plaintiffs' case could move forward promptly and efficiently. (Concurrently filed Declarations of Tina Wolfson ("Wolfson Decl.") ¶ 17 and Daniel S. Robinson ("Robinson Decl.") ¶ 16.) Ultimately, the majority of Plaintiffs' counsel supported these two attorneys' Motion for Appointment of Interim Co-Lead Class Counsel and Plaintiffs' Steering Committee and, on February 10, 2016, the Court appointed Ms. Wolfson and Mr. Robinson as interim co-lead class counsel, and appointed a Plaintiffs' Steering Committee ("PSC") consisting of attorneys from several other law firms (collectively, "Class Counsel"). (Dkt. 130.)

**B.    Class Representative Vetting**

Before and immediately after the leadership appointment, Class Counsel collaborated with all Plaintiffs' counsel — including counsel who submitted competing leadership applications — to ensure that all Plaintiffs preserved relevant documents, and to vet all prospective plaintiffs for a consolidated amended complaint ("CAC"). In the months leading up to the Court-imposed deadline to file the CAC, Class Counsel worked cooperatively and efficiently with other plaintiffs' retained counsel to review underlying complaints, documents, and questionnaires, and conduct telephonic vetting interviews of over 100 potential class representatives. The

leading candidates were then further screened and vetted, until 58 proposed class representatives were selected.  (Wolfson Decl. ¶ 22; Robinson Decl. ¶ 21.)

### C.    The Pleadings

Drawing upon the PSC's respective expertise on particular state law issues, Plaintiffs drafted and filed their CAC on April 15, 2016, alleging Experian breached its duties under numerous state and federal laws by, among other things: (a) failing to implement and maintain adequate data security practices to safeguard Plaintiffs' and Class Members' PII; (b) failing to detect the Data Breach in a timely manner; (c) failing to disclose that Defendants' data security practices were inadequate to safeguard Class Members' PII; and (d) failing to provide adequate and timely notice of the Data Breach.  (Dkt. 151; Wolfson Decl. ¶ 23; Robinson Decl. ¶ 22.)

Plaintiffs alleged claims for violation of the Fair Credit Reporting Act ("FCRA"), negligence, negligence *per se*, and violations of 44 state statutes, and proposed to represent a nationwide class and statewide subclasses for Alabama, Arizona, California, Colorado, Delaware, District of Columbia, Florida, Georgia, Hawaii, Illinois, Indiana, Kentucky, Massachusetts, Michigan, Minnesota, Missouri, Nevada, New Jersey, New Mexico, New York, North Carolina, Ohio, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, and Washington.  (Dkt. 151.)

After significant meet-and-confer efforts between the Parties, and discussions with the Court during Case Management Conferences as to how best to streamline the initial phase of this litigation, the Parties stipulated that Experian's motion to dismiss under Federal Rules of Civil Procedure ("FRCP") 12(b)(6) would be limited to address Plaintiffs' FCRA claims and state law claims under California, Illinois, New York, and Ohio law.  (Wolfson Decl. ¶ 24; Robinson Decl. ¶ 23.)  After briefing, the Court heard oral argument and issued an order granting in part and denying in part Experian's motion to dismiss. (Dkt. 213.)  The Court dismissed Plaintiffs' FCRA claims but rejected Experian's argument that the economic loss rule precludes the

4

negligence causes of action, and upheld most of the state consumer claims. *Id.* Experian answered the CAC on February 13, 2017. (Dkt. 215.)

The Parties continued to discuss management of the case and appeared at regular Case Management Conferences to update the Court on the status of the litigation. (Wolfson Decl. ¶ 20; Robinson Decl. ¶ 21.) Following the Court's setting of a Scheduling Conference for January 29, 2018, Plaintiffs prepared and shared with Experian a draft motion for class certification, which Plaintiffs intended to file in February 2018. (Wolfson Decl. ¶ 36; Robinson Decl. ¶ 35.)

**D.   Discovery**

Discovery efforts in the litigation were significant on the part of both sides, and numerous disputes were highly contested. While most disputes were resolved by the Parties, several were briefed and argued to the Court. First, there was a dispute over the number of custodians whose electronically stored information ("ESI") would be produced. (Wolfson Decl. ¶ 30; Robinson Decl. ¶ 29.) Experian asked the Court to limit the number to 15 while Plaintiffs asked that the limit be 75. After briefing and oral argument, the Court ordered a soft custodian cap of 50, but allowed Plaintiffs to seek an increase of the number of custodians in the future if necessary. (Dkt. 157.)

Second, the Parties disputed whether Experian would be allowed to redact for relevancy in its ESI production. The Court ordered the Parties to submit a joint statement regarding the Parties' positions on redaction for each category of information. (Dkt. 172.) Noting the "exponentially increasing expense and complexity of waging discovery wars in large, class-action cases," the Court granted Plaintiffs' proposal on all 15 categories of information on July 25, 2016. (Dkt. 183.)

Through additional meet-and-confer efforts, and with the Court's input on issues such as the custodian and relevancy redaction issues described above, the Parties agreed upon and filed a proposed Protective Order and an ESI Protocol, which the Court approved. (Dkts. 186-87; Wolfson Decl. ¶ 27; Robinson Decl. ¶ 26.)

MOTION FOR FINAL APPROVAL

Ultimately, Experian has produced more than 66,000 documents totaling nearly 300,000 pages, which Plaintiffs reviewed and used in depositions of key witnesses. (Wolfson Decl. ¶ 33; Robinson Decl. ¶ 32.)  Plaintiffs took the depositions of several key Experian witnesses, including an FRCP 30(b)(6) deposition of Experian's Vice President and Global Head of Corporate Security and Incident Response, and depositions of Experian's Senior Program Manager, Senior Director of IT Development and Information Security, and Vice President of Technology and Client Services.  (Wolfson Decl. ¶ 35; Robinson Decl. ¶ 34.)

Experian served 22 interrogatories and 12 requests for production on all Plaintiffs.  Plaintiffs served written responses on June 30, 2016 and, the following month, produced nearly 1,200 pages of documents from Plaintiffs.  The Parties engaged in significant meet and confer efforts regarding these responses.  (Wolfson Decl. ¶ 28; Robinson Decl. ¶ 27.)

Absent from Experian's production was a third-party forensic report regarding the Data Breach.  The Parties spent significant time meeting and conferring over its production, which raised a dispute concerning Experian's privilege log concerning the report and related documents it withheld from production. (Wolfson Decl. ¶ 32; Robinson Decl. ¶ 31.)   Ultimately, Plaintiffs filed a motion to compel, which Experian opposed.  (Dkts. 231-38.)

The Court denied Plaintiffs' motion to compel, and the Parties then engaged in extensive negotiations concerning Plaintiffs' planned review of the server images on which Experian's forensic consultants relied in producing the forensic report at issue. This required extensive consultation with Plaintiffs' data security expert and a lengthy meet-and-confer process with Experian regarding how production of the server images and their review would be accomplished.  Ultimately, the Parties were able to negotiate a Server Image Review Agreement, which entailed a mutually agreed third-party vendor, and a physically and technologically secure environment

MOTION FOR FINAL APPROVAL

in which the review could be conducted, and which specified the costs each party would bear for the review.  (Wolfson Decl. ¶ 34; Robinson Decl. ¶ 33.)

### E.    Settlement Negotiations

Throughout the discovery process, the Parties engaged in arm's-length discussions regarding a potential settlement.  On March 15, 2017, the Parties participated in a private mediation with the Honorable Margaret Nagle (Ret.).  (Wolfson Decl. ¶ 37; Robinson Decl. ¶ 36.)  Although the Parties discussed their respective positions, they made little progress and continued to litigate the case and engage in discovery.  (*Id.*)  On July 28, 2017, the Parties again participated in a private mediation, this time with the Honorable Carl J. West (Ret.), at which they made significant progress toward resolution of the Action.  (Wolfson Decl. ¶ 38; Robinson Decl. ¶ 37.)  Following this mediation, the Parties continued to engage in arm's-length settlement discussions with the help of Judge West.  (*Id.*)  On January 26, 2018, the Parties participated in an all-day Settlement Conference with then-sitting Magistrate Judge Jay C. Gandhi (since retired) and reached an agreement in principal.  (Wolfson Decl. ¶ 39; Robinson Decl. ¶ 38.)

Since the agreement in principal was reached, the Parties exchanged numerous drafts of the Settlement Agreement and its exhibits, negotiating numerous details to maximize the benefits to the Class.  (*Id.*)  Class Counsel engaged in a vigorous, months-long effort with T-Mobile (and a third-party IT consultant selected by T-Mobile) to obtain all available email addresses from T-Mobile records in order to provide the best practical notice while maximizing benefits to Class Members.  (*Id.*)

Class Counsel obtained bids from and negotiated with several third-party administrators in order to get the best deal for the Class.  After soliciting competing bids for the class for administration of the Settlement, Class Counsel negotiated an agreement with KCC, LLC ("KCC"), under which KCC's costs will be capped at certain levels, depending on the claim filing rate.  More specifically, KCC agreed not to charge in excess of $1.08 million if the claims rate were 1% or less, $1.205 million

7

if the claims rate were 1%-2%, $1.450 million if the claims rate turned out to be 2%-4% (which appears the most likely outcome at this point), and $1.545 million if the claims rate were to exceed 4%. These figures include all costs associated with Class Member data management, legal notification, telephone support, claims administration, and disbursements and tax reporting; but they do not include postage and costs associated with a potential second distribution, which Class Counsel negotiated along similar claim rate thresholds, at a potential additional cost of $109,476 to $337,722. (Wolfson Decl. ¶ 41; Robinson Decl. ¶ 40.)

Class Counsel also solicited competing bids from alternative providers of Credit Monitoring and Insurance Services in accordance with the Settlement's terms. Ultimately, Class Counsel negotiated for Identity Guard to provide the Settlement's Credit Monitoring and Insurance Services at a cost of $1.3 million to $2.5 million, depending on the number of Claimants who enroll in such services. If 1% or less of the entire Settlement Class enroll in the Credit Monitoring and Insurance Services, the cost would be $1.3 million, and if more than 1% enroll, the cost would be $2.5 million. (Wolfson Decl. ¶ 43; Robinson Decl. ¶ 42.)

Finally, Class Counsel prepared and filed the Settlement along with the Motion for Preliminary Approval (Dkts. 285-87), which the Court granted on December 3, 2018 (Dkt. 289) (the "Preliminary Approval Order").

### F.   Settlement Administration

Since the Preliminary Approval Order, Class Counsel worked alongside KCC to ensure the notice and claims process went smoothly for Class Members. Class Counsel repeatedly audited the website to make sure it was correct and user-friendly, reviewed weekly reports from, and conferred with, KCC about the progress of the claims process, and responded to hundreds of inquiries from Class Members that came into their respective offices, as well as other counsel's offices. (Wolfson Decl. ¶ 46; Robinson Decl. ¶ 44.)

Class Counsel will continue to expend significant efforts to communicate with

Class Members, seek to ensure that the offered benefits reach Class Members, seek final approval of the Settlement, and respond to any criticism that may be filed, including potential appeals.  (Wolfson Decl. ¶ 47; Robinson Decl. ¶ 45.)

## III.  TERMS OF THE SETTLEMENT

### A.    The Class Definition

The proposed Settlement Class is defined as follows:

> The 14,931,074 T-Mobile USA customers or applicants who are identified on the Settlement Class List, including Plaintiffs, whose PII was stored on Experian Information Solutions, Inc.'s and Experian Holdings, Inc.'s server that was accessed by an unauthorized user in the Data Breach.  Excluded from the Settlement Class are: (1) the Judges presiding over the Action, and members of their families; (2) the Defendants, their subsidiaries, parent companies, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current or former officers, directors, and employees; (3) Persons who properly execute and submit a Request for Exclusion prior to the expiration of the Opt-Out Period; and (4) the successors or assigns of any such excluded Persons.

(Dkt. 285, (the "Settlement Agreement" or "SA") ¶ 47.)  This class definition differs from the definition included in the Settlement Agreement and in prior briefing concerning it, in that this definition reflects the reduction in class size from 15,926,817 to 14,931,074 unique Class Members, resulting from de-duplication, as explained by the Settlement Administrator.   (Dkt. 296-3, Declaration of Lana Lucchesi Re: Notice Procedures at ¶ 2.)

### B.    The Settlement Benefits

The $22 million non-reversionary Settlement Fund will be used to provide Participating Settlement Class Members with the following Settlement Benefits:

#### 1.    Credit Monitoring and Insurance Services

Each Participating Settlement Class Member who submits a valid claim may elect to receive credit monitoring services and identity theft insurance in the form of an enhanced version of a product called Identity Guard Individual Total Plan.  (Dkt. 286-5 ("J. Thompson Decl.") ¶ 7.)  The Credit Monitoring and Insurance Services include: (a) Three-Bureau Credit Monitoring; (b) Real-Time Instant Authentication

9

Alerts; (c) LexisNexis Authentication Alerts (covering, for instance, court records); (d) Dark Web Monitoring; (e) Threat Alerts powered by IBM Watson; (f) Customer Support and Victim Assistance; (g) $1 Million reimbursement insurance from AIG; (h) Anti-Phishing & Safe Apps for iOS and Android Mobile devices; and (i) Safe browsing software.  (*Id.*)

The Credit Monitoring and Insurance Services are superior to many competing products on the market and are tailored to provide Settlement Class Members with the best credit monitoring available.  (*Id.* ¶¶ 3-7.)  However, if a Claimant already has substantially similar Credit Monitoring and Insurance Services, then the term of the Product offered to that individual under the Settlement will be extended by the remaining term of the individual's existing services, so that he or she nonetheless will receive this valuable benefit.  (*Id*. ¶ 8.)

The Credit Monitoring and Insurance Services, if made available to the general public, would be sold for over $19.99 per month.  (*Id.* ¶ 7; *see also* www.identityguard.com/plans/total (last visited October 24, 2018).)  Accordingly, the value of this benefit to the Class is at least $7,163,332 for every 0.1% of the 14,931,074 Settlement Class Members that elect to receive this benefit, before excluding the cost of the Credit Monitoring and Insurance Services.[3]  (Settlement Agreement ¶ 86; *see also* Dkt. 286-6 ("Siciliano Decl.") ¶¶ 8-9.)

**2.    Cash Payment for Reimbursement of Out-of-Pocket Costs**

In addition to the Credit Monitoring and Insurance Services, each Claimant may be entitled to receive up to $10,000 for reimbursement of Out-of-Pocket Costs fairly traceable to the Data Breach.  To receive a payment for Out-of-Pocket Costs, the Participating Settlement Class Member must provide documentation supporting a claim for Out-of-Pocket Costs, including but not limited to credit card statements,

---

[3] $14,931,074 \times 0.1\% = 14,931$.  $14,931 \times 24$ months $\times \$19.99 = \$7,163,332.06$.  The cost of the Credit Monitoring and Insurance Services will be paid out of the $22 million non-reversionary Settlement Fund, and under no circumstances will those costs exceed $2.5 million.  (Wolfson Decl. ¶ 12; Robinson Decl. ¶ 11.)

bank statements, invoices, telephone records, or receipts ("Reasonable Documentation"). (Dkt. 285, Settlement Agreement ¶¶ 38, 74.) Out-of-Pocket Costs cannot be documented solely by a personal declaration from the Claimant. The Out-of-Pocket Costs will be deemed fairly traceable to the Data Breach by the Settlement Administrator if the Out-of-Pocket Costs occurred on or after September 14, 2015, and the Settlement Administrator determines the Out-of-Pocket Costs incurred are related to the type of PII disclosed in the Data Breach. (*Id.* ¶ 77.)

### 3.     Cash Payment for Documented Time or Default Time

In addition to the Credit Monitoring and Insurance Services and payment for Out-of-Pocket Costs, each Claimant may be entitled to receive payment for up to seven hours of lost time fairly traceable to the Data Breach at $20 per hour ("Documented Time"). To receive a payment for Documented Time, the Claimant must provide Reasonable Documentation. (*Id.* ¶¶ 39, 75.) Documented Time cannot be documented solely by a personal certification, declaration or affidavit from the Claimant. The Documented Time will be deemed fairly traceable to the Data Breach by the Settlement Administrator if the Documented Time occurred on or after September 14, 2015, and the Settlement Administrator determines the Documented Time incurred is related to the type of PII disclosed in the Data Breach. (*Id.* ¶ 78.)

All Claimants who do not elect to receive a payment for Documented Time, or whose claim for Documented Time is rejected by the Settlement Administrator, will receive a payment for lost time addressing or remedying issues related to the Data Breach ("Default Time"). (*Id.* ¶ 75(d).) Thus, all Claimants will be eligible to receive cash payments in addition to the Credit Monitoring and Insurance Services. The Default Time Payment is $20 per hour for two hours, or $40 total. (*Id.*)

Payments will be reduced on a *pro rata* basis if the Settlement Fund otherwise would be depleted. (*Id.* ¶ 81(b).) Were Default Time Payments to be reduced below $3 in this manner, the Net Settlement Funds for Default Time Payments instead

MOTION FOR FINAL APPROVAL

would be used to provide additional months of Credit Monitoring and Insurance Services to all Participating Settlement Class Members. (*Id.*)

In the event that any monies remain in the Settlement Fund more than 150 days after the distribution of cash payments to the Participating Settlement Class Members, a subsequent Settlement Payment will be evenly distributed to all Participating Settlement Class Members with Approved Claims, provided that the average check amount is equal to or greater than $3. In the event that a subsequent Settlement Payment made to Participating Settlement Class Members would exceed $250, the Parties will make a proposal to the Court on how to disburse the remaining Net Settlement Fund. If the average check amount in a distribution would be less than $3, the remaining Net Settlement Fund will be used to extend the Credit Monitoring and Insurance Services to Participating Settlement Class Members receiving that benefit for as long as possible. Any amount remaining in the Net Settlement Fund after said extension is accomplished, would be distributed to Rose Foundation's Consumer Privacy Rights Fund, the Non-Profit Residual Recipient. (*Id.* ¶ 82.)

### 4. Remedial Measures Attributable to the Settlement

An additional benefit of the Settlement is the remedial measures that Experian has enacted as a result of this litigation, which will benefit all Class Members regardless of whether they submit a claim. Experian has attested that these remedial measures cost $11.7 million and they include, but are not limited to, numerous security enhancements to Experian's network, remediation of additional vulnerabilities, heightened encryption throughout its network and its user database, implementation of its Security First Program consisting of 82 security-related projects, and hiring an additional 60 full-time employees. (*Id.* ¶ 85; *see also* Dkt. 285-6, Settlement Agreement Ex. F ("S. Thompson Decl.") ¶¶ 8-9.)

### 5. The Value of the Settlement Exceeds $150 Million

Any valuation of the Settlement must take into account the $22 million non-reversionary Settlement Fund, at least $11.7 million in remedial measures undertaken

12

by Experian as a result of this litigation and Settlement, and the value of the Credit Monitoring and Insurance Services.

The Settlement Fund alone comes up to $1.47 per person, based on the Class size of 14.93 million after de-duplication,[4] which compares favorably to other finally approved data breach settlements (*e.g.*, *In re Anthem, Inc. Data Breach Litigation*, No. 5:15-MD-02617-LHK (N.D. Cal.) ($1.39), *In re The Home Depot, Inc. Customer Data Security Breach Litigation*, No. 1:14-md-02583-TWT (N.D. Ga. 2016) ($.51 to $.68), and *In re Target Corp. Customer Data Security Breach Litigation*, No. 0:14-md-02522-PAM (D. Minn. 2015) ($.15)), but does not factor in the actual Settlement value here, which should at the very least include the Credit Monitoring and Insurance Services.

### a. The Value of the Credit Monitoring and Insurance Services Exceeds $130 Million to Date

The retail value of these Credit Monitoring and Insurance Services (rather than the cost) is the proper gauge to apply here, given that this is the benefit Class Members actually receive. *See, e.g.*, *Johansson-Dohrmann v. Cbr Sys., Inc.*, No. 12-cv-1115-MMA (BGS), 2013 WL 3864341, at *9 (S.D. Cal. July 24, 2013) (including value of credit monitoring in value of common fund, and finding requested fees "well within the 25% benchmark"); *In re The Home Depot, Inc., Customer Data Sec. Breach Litig.*, No.: 1:14-md-02583-TWT, 2016 WL 6902351, at *4 (N.D. Ga. Aug. 23, 2016) (granting final approval and reasoning that "[t]hese services have a retail value of approximately $180 per enrollee"); *Lockwood v. Certegy Check Servs., Inc.*, No. 07-cv-01434, Dkt. 101 at 9 n.4 (M.D. Fla. Sept. 3, 2008) ("Using the Representative Plaintiffs' estimates of the value of the monitoring . . . ."); *In re Michaels Stores Pin Pad Litig.*, No. 11-cv-03350, Dkts. 103 (fee motion), 107 (final

---

[4] As the Settlement Administrator has explained, the Class size was reduced through de-duplication, from 15,926,817 to 14,931,074.  (Dkt. 296-3, Lucchesi Decl. ¶ 2.)

MOTION FOR FINAL APPROVAL

approval order) (N.D. Ill. Mar. 3 & Apr. 17, 2013) (granting fee request justified under percentage method based on retail value of credit monitoring).

Based on current Claims figures, the Credit Monitoring and Insurance Services present an additional value of $138.8 million to the Settlement (which subtracts the cost of providing such services).[5]  Adding this value to that of the Settlement Fund ($22 million) results in a current Settlement value of $160.8 million.  (Wolfson Decl. ¶¶ 7, 10-13; Robinson Decl. ¶¶ 7, 13.)  This value does not include the value of the remedial measures implemented as a result of this litigation ($11.7 million), which increases the total value to $172.5 million.

### b. The $11.7 Million Value Ascribed to Experian's Remedial Measures Is a Conservative Measure

The Settlement also confers at least $11.7 million worth of remedial measures that Experian has undertaken, and will continue to implement, as a result of this litigation and Settlement.  (SA Ex. F at ¶ 9.)  These remedial measures include numerous enhancements to Experian's network, remediation of additional vulnerabilities, heightened encryption throughout its network and its user database, implementation of its Security First Program consisting of 82 security-related projects, and the hiring of an additional 60 full-time employees.  (*Id.* ¶ 8.)  Because the remedial measures bolster Experian's global security — not just the T-Mobile interface at issue in the present Data Breach — these remedial measures provide an enormous benefit to *all* Class Members, regardless of whether they submit a claim for other benefits.  (*Id.*)

Here, the cost to Experian of implementing these remedial measures presents a conservative measure of their value, which certainly is no less than that cost.  As one of the major credit bureaus in the United States, the improvements to Experian's

---

[5] This figure represents: 294,493 (Credit Monitoring and Insurance Services claims to date) × 24 (months) × $19.99 (value per month) = $141,285,961.68 - $2,500,000 (Credit Monitoring and Insurances Services cost) = $138,785,961.68 (present value of Credit Monitoring and Insurance Services).

security resulting from this litigation have real value to each and every Class Member, regardless of whether he or she submits a Claim Form — beyond the cost to Experian.

Because "the value to individual class members of benefits deriving from" these remedial measures "can be accurately ascertained," the Court may "include such relief as part of the value of a common fund for purposes of applying the percentage method of determining fees." *Staton v. Boeing Co.*, 327 F.3d 938, 974 (9th Cir. 2003); *see also In re Checking Account Overdraft Litig.*, No. 1:09-MD-02036-JLK, 2013 WL 11319243, at *13 (S.D. Fl. Aug. 2, 2013) (adding value of non-assessed overdraft fees to common fund before applying percentage method); *McCoy v. Health Net, Inc.*, 569 F. Supp. 2d 448, 478 (D.N.J. 2008) (including value of injunctive relief that benefits the class in percentage-of-recovery calculation). However, even excluding any valuation whatsoever for the very real benefits conferred on Class Members by Experian's remedial measures, the Settlement still is valuable enough to merit final approval — $160.8 million excluding any value whatsoever for Experian's remedial measures. (Wolfson Decl. ¶ 13; Robinson Decl. ¶ 13.)

### 6.    Attorneys' Fees, Costs, and Service Awards

On March 6, 2019, Class Counsel moved the Court for an award of attorneys' fees in the amount of $10.5 million, expenses in the amount of $152,854.28, and Class Representative Service Awards in the amount of $2,500 each. (Dkt. 296.) As explained in that motion, the requested award is supported by the results achieved, the risk of continued litigation, the Settlement's injunctive relief, the value of the Settlement, the quality of Plaintiffs' representation, awards in comparable cases, the contingent nature of the representation, the response of the Class, and Plaintiffs' counsels' time spent on the matter.

MOTION FOR FINAL APPROVAL

### a. Attorneys' Fees and Expenses

As explained more fully in Plaintiffs' Motion for Class Representative Service Awards and Attorneys' Fees and Expenses (*id.*), the requested attorney fee award represents a modest multiplier of 1.65 on the collective lodestar of $6.35 million expended by the firms that contributed to the success of this litigation, consistent with Class Counsel's commitment at the outset of the case not to seek a multiplier in excess of 1.75. (Dkt. 296 at 1.) *See, e.g.*, *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 (9th Cir. 2002) (applying a lodestar multiplier of 3.65 and noting that the majority of cases apply a multiplier between 1.0 and 3.0).

Attorneys' fees were negotiated at the final mediation with Judge Gandhi only after agreement was reached on all material terms of the Settlement. (Wolfson Decl. ¶ 39; Robinson Decl. ¶ 38.) *See also In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 445 (3d Cir. 2016), *as amended* May 2, 2016 (deferring discussion of fees until after material settlement terms are agreed upon is a practice routinely approved by courts). Class Members had until March 27, 2019, to object to the fee motion under Rule 23(h), consistent with Ninth Circuit authority. *See Mercury Interactive Corp. Sec. Litig. v. Mercury Interactive Corp.*, 618 F.3d 988, 993-94 (9th Cir. 2010).

In accordance with the Settlement, Plaintiffs also seek reimbursement of the $152,854.28 in unreimbursed litigation costs incurred by all Plaintiffs' Counsel litigating this action to date, and securing the present Settlement. (Dkt. 296 at 24-25; Dkt. 296-1, Wolfson Decl. ISO Fees & Expenses ¶¶ 49-62; Dkt. 296-2, Robinson Decl. ISO Fees & Expenses ¶¶ 48-67.) The Class Notice informed Class Members that Class Counsel would seek such an award of attorneys' fees and expenses. (Settlement Agreement, Ex. C (Settlement Notice) ¶ 26.)

### b. Service Awards

In the Settlement Agreement, subject to Court approval, Experian agrees not to oppose the payment of $2,500 service awards to each Plaintiff for their service as

16

Class Representatives.  (Settlement Agreement ¶ 101.)  Plaintiffs have moved for service awards in that amount and, as set forth in their declarations and in the declarations of Class Counsel, these Plaintiffs have been enthusiastic and active class representatives.  (Dkt. 286-3, Ex. 2.)  They investigated the matter prior to and after retaining their respective attorneys, participated in the plaintiff vetting process implemented by Class counsel, reviewed and approved their original complaints, the CAC, discovery, and other documents, kept in contact with counsel to monitor the progress of the litigation, and reviewed and communicated with their respective counsel and Class Counsel regarding the Settlement Agreement and its exhibits.  Each put their name and reputation on the line for the sake of the Class, and no recovery would have been possible without their critical role.  (*Id.*)  The proposed $2,500 service awards are consistent or less than those approved in other data breach class action settlements.  *See, e.g.*, *In re Anthem, Inc. Data Breach Litig.*, No. 15-MD-02617-LHK, 2018 WL 3960068, at *30 (N.D. Cal. Aug. 17, 2018) (awarding service awards of $7,500 to 29 named plaintiffs and $5,000 to 76 named plaintiffs).

## IV.  THE REACTION OF THE CLASS TO THE SETTLEMENT HAS BEEN OVERWHELMINGLY POSITIVE

### A.  The Claims Rate Is Approximately 3% to Date

The Class Members have had an overwhelmingly favorable response to the Settlement.  The Claims Deadline is April 11, 2019.  As of this filing, a total of 478,970 claims have been received, including 262,958 electronic claims and 216,012 postcard claims, with a total 434,998 unique Claims.  (Lucchesi Supp. Decl. ¶ 8.) This amounts to a response rate of 2.91% of the 14.93 million Class Members, to date.  294,493 of these Claimants have elected to receive Credit Monitoring and Insurance Services.  (*Id.*)

A supplemental declaration detailing the final claims rate will be filed after the April 11, 2019 Claims Deadline, and prior to the May 5, 2019 Final Fairness Hearing.

1  Based on these current figures, the Credit Monitoring and Insurance Services
2  present an additional value of $138.8 million to the Settlement (which subtracts the
3  cost of providing such services).  This value, combined with the Settlement Fund
4  ($22 million) and the remedial measures implemented as a result of this litigation
5  ($11.7 million), results in a current Settlement value of $172.5 million.  (Wolfson
6  Decl. ¶¶ 12-13; Robinson Decl. ¶¶ 12-13.)

7  **B.    The Six Objections to the Settlement Should Be Overruled**

8  A total of six objections have been received, two of which come from Class
9  Members who also exclude themselves from the Settlement, and thus lack standing.
10  (Dkt. 308, Notice of Objections.)  This "Court 'may appropriately infer that a class
11  settlement is fair, adequate, and reasonable when few class members object to it.'"
12  *Garner v. State Farm Mut. Auto. Ins. Co.*, No. 08-1365, 2010 WL 1687832, at *14
13  (N.D. Cal. Apr. 22, 2010) (internal citations omitted). "It is established that the
14  absence of a large number of objections to a proposed class action settlement raises
15  a strong presumption that the terms of a proposed class settlement action are
16  favorable to the class members."  *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d
17  1036, 1043 (N.D. Cal. 2008) (internal quotation marks omitted); *Dupler v. Costco
18  Wholesale Corp.*, 705 F. Supp. 2d 231, 239 (E.D.N.Y. 2010) ("[A] small number of
19  class members seeking exclusion or objecting indicates an overwhelming positive
20  reaction of the class.").

21  **1.    The Two Objectors Who Exclude Themselves from the**
22  **Settlement Lack Standing**

23  Two of the Class Members asserting objections — Rickey Lett and
24  Christopher Davidson — also have chosen to exclude themselves from the
25  Settlement.  Because these Class Members have excluded themselves from the
26  Settlement, it does not affect them and they lack standing to assert their objections in
27  this Court. *See, e.g.*, *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 572, 578-79
28  (9th Cir. 2004) (reasoning that one must be party bound by class settlement in order

18

to object to it, and finding attorneys lacked such standing).  Moreover, neither of these objections has any substantive merit — Mr. Lett asserts that $10,000 maximum on out-of-pocket losses is not enough, but does not assert that he suffered such damages (Dkt. 308-1), while Mr. Davidson complains of not receiving notice of this action prior to the Settlement Notice, and goes on to describe what he perceives as the legal basis for his own claims against Experian (Dkt. 308-2).

### 2. Objectors Harrell and Sun Do Not Take Issue with the Settlement Itself

Objector Joshua Harrell, an inmate in a California State prison, asserts that someone made a fraudulent attempt to open a T-Mobile account in his name, and complains that it is too early for the extent of injuries caused by the Data Breach to be ascertained.  He does not make any argument that the Settlement itself is inadequate in any way.  (Dkt. 308-4.)

Shang Sun objects on the basis that she never received any prior notification of the Data Breach, before receiving the Settlement Notice.  (Dkt. 308-3.)  Ms. Sun does not make any argument against the merits of the Settlement itself, nor does she appear to appreciate that this action is based on, *inter alia*, Plaintiffs' allegations that Experian failed to fulfill its obligations to notify victims of the Data Breach about it in a timely and complete manner.

### 3. The Jacobshagen Objection Lacks Merit

Objector Robin Jacobshagen asserts that the Settlement should deliver Credit Monitoring and Insurance Services for "the rest of my life." (Dkt. 308-5.)  Although that would be nice, "Settlement is the offspring of compromise; the question we address is not whether the final product could be prettier, smarter, or snazzier, but whether it is fair, adequate and free from collusion." *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1027 (9th Cir. 1998).

### 4. The Scheffler Objection Lacks Merit

19

MOTION FOR FINAL APPROVAL

Objector Troy Scheffler, represented by attorney Peter Nickitas, asserts a plethora of arguments against the Settlement, none of which are well taken. Preliminarily, while Mr. Nickitas includes a document that appears to be a motion for admission *pro hac vice*, he totally fails to comply with this Court's requirements for such motions, which include the Court's Form Application to Appeal *Pro Hac Vice*. That form would require Mr. Nickitas to declare, *inter alia*, that he is not currently suspended and has never been disbarred, which may present a challenge given that Class Counsel's investigation revealed that Mr. Nickitas has been suspended multiple times from the practice of law in Minnesota and Wisconsin, and fined, for a variety of malfeasance. (Wolfson Decl. ¶¶ 51-53.) Class Counsel's investigation also revealed that Mr. Nickitas has represented Mr. Scheffler previously, in some of the 37 cases in which Mr. Scheffler has appeared as a plaintiff, and there may be more. Mr. Scheffler, meanwhile, has been convicted of drunk driving on multiple occasions. (*Id.* ¶ 55.)

Mr. Scheffler denigrates the Settlement's Notice Program, calling the Notice here "weak at best," though he received such Notice himself. (Dkt. 308-6.) Mr. Scheffler does not appreciate that Notice was issued both via mail and via email, or that, as the Settlement Administrator attests, Notice reached over 85% of the Class. (Peak Decl. ¶ 8.) Mr. Scheffler asserts that Class Counsel "made no evident effort to reach out to potential class members through T-Mobile," ignoring the repeated discussion of how Class Counsel negotiated with T-Mobile at length, finally procuring from T-Mobile the email addresses used by the Settlement Administrator to disseminate Notice. (Wolfson Decl. ¶¶ 39, 44; Robinson Decl. ¶¶ 38, 43.)

Mr. Scheffler argues that Notice should have been included in T-Mobile bills, which fails to appreciate that: (a) T-Mobile, whose customer contracts include an arbitration clause, would have to cooperate in any such effort, and (b) the Class does not match T-Mobile's customer base, now or in the past. The Class consists of consumers who applied for (not who acquired) certain T-Mobile services from

20

September 2013 through September 2015; accordingly, many Settlement Class Members likely never were, or no longer are, T-Mobile customers, and certainly not every T-Mobile customer is a Class Member. (Dkt. 151, CAC ¶ 69.)

Mr. Scheffler complains about the Class size reduction from 15.9 million to 14.9 million Class Members, without recognizing, as Plaintiffs emphasized everywhere this change previously has been addressed, that it is due to de-duplication within the Class List provided by Experian. (Dkt. 296-3 at ¶ 2.) Nor does Mr. Scheffler appreciate that Plaintiffs originally contended the Class consisted of "an estimated 15 million consumers." (Dkt. 151, CAC ¶ 1.)

Mr. Scheffler denigrates the Settlement's Credit Monitoring and Insurance Services, by arguing they are no better than the free credit monitoring provided by Credit Karma, which according to Mr. Scheffler "monitors Transunion and Equifax credit scores" and reports. Mr. Scheffler does not address the many benefits presented by the Settlement's Credit Monitoring and Insurance Services, including the insurance component of the services, for one thing, nor does he explain why monitoring the two bureaus *other than Experian* would be sufficient, given that this case centers on an *Experian* Data Breach. The previously filed Declaration of Jerry Thompson (Dkt. 286-5) describes the many benefits conveyed under the Settlement's Credit Monitoring and Insurance Services, including $1 million insurance, three-bureau credit monitoring, public records monitoring, dark web monitoring, and threat alerts powered by IBM "Watson," none of which Mr. Scheffler addresses.

Mr. Scheffler argues that the remedial measures that Experian commits to undertake in Settlement, costing at least $11.7 million, should not be included in the Settlement's value. However, even without considering this component, the Settlement continues to be valued at $160.8 million, and Mr. Scheffler fails to argue (he cannot) that the Settlement's remedial measures are worthless, given that all Class Members will benefit from the strengthening of Experian's cyber defenses entailed. (SA Ex. F at ¶ 9.)

MOTION FOR FINAL APPROVAL

1    Mr. Scheffler makes a number of other arguments, some of which are
2    unintelligible, and others of which lack any support whatsoever, such as that
3    paralegal fees always are "built into" attorneys' hourly rates, or that no expert fees
4    are merited here (despite the highly technical nature of the case and of the requisite
5    forensic analysis that confronted Class Counsel).  Such issues have been addressed
6    previously, and the basis for Class Counsel's lodestar and expenses were fully set
7    forth in Class Counsels' declarations in support of their Motion for Fees, which Mr.
8    Scheffler does not refute.  (Dkt. 296-1 (Wolfson Decl. ISO Fees & Expenses); 296-
9    2 (Robinson Decl. ISO same).)  Indeed, it is well established that paralegal hours are
10   compensable, and not rolled into attorneys' fees.  *See, e.g.*, *In re Anthem, Inc. Data*
11   *Breach Litigation*, No. 5:15-MD-02617-LHK, Dkt. 1008, at 10, 12 (N.D. Cal. April
12   24, 2018) (special master's report including analysis of paralegal hourly rates);
13   *USAO    Attorney's    Fees    Matrix — 2015-2019, available    at*
14   <https://www.justice.gov/usao-dc/file/796471/download> (last visited April 8,
15   2019) (describing rates used by US Attorney's Office for District of Columbia to
16   evaluate requests for attorney's fees, and including paralegal rates).

## V.  FINAL APPROVAL IS APPROPRIATE

### A.    Legal Standards

19   The Court completed the first step in the settlement approval process when it
20   issued the Preliminary Approval Order.  The second step — dissemination of notice
21   to Class Members — has been implemented.  (Lucchesi Supp. Decl. ¶¶ 3-7.)  By this
22   motion, Plaintiffs respectfully request that the Court take the third and final step in
23   the process, and grant final approval to the Settlement.

### B.    The Court Should Finally Approve the Settlement

25   Public policy "strong[ly] . . . favors settlements, particularly where complex
26   class action litigation is concerned."  *In re Syncor ERISA Litigation*, 516 F.3d 1095,
27   1101 (9th Cir. 2008); *Churchill Village*, 361 F.3d at 576; *Class Plaintiffs v. City of*
28   *Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992).

22

In weighing final approval of a class settlement, the Court's role is to determine whether the settlement, taken as a whole, is fair, reasonable, and adequate. *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003) (citing *Hanlon*, 150 F.3d at 1026). The Ninth Circuit has established a list of factors to consider when assessing whether a proposed settlement is fair, reasonable and adequate: (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the benefits offered in the settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement. *See Churchill Village*, 361 F.3d at 575; *Hanlon*, 150 F.3d at 1026. Application of these factors here supports the conclusion that the Settlement Agreement is fundamentally fair, reasonable, and adequate, and should be finally approved.

When "a settlement agreement is negotiated *prior* to formal class certification," a court also must determine "that the settlement is not the product of collusion among the negotiating parties," which requires scrutiny for signs of collusion, including "(1) when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded[;]" "(2) when the parties negotiate a 'clear sailing' arrangement providing for the payment of attorneys' fees separate and apart from class funds[;]" and "(3) when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund[.]" *In re Bluetooth Headset Prod. Liab. Litig*, 654 F.3d 935, 946-47 (9th Cir. 2011) (emphasis in original) (internal quotation marks and citations omitted). None of these signs of collusion exist in the present proposed Settlement and, put simply, there is no collusion. The lengthy nature of the settlement negotiations here, involving multiple mediators and intertwined with hard-fought litigation over a period of years, is convincing evidence that the Settlement does not

23

result from collusion. *See, e.g.*, *Shames v. Hertz Corp.*, No. 07-CV-2174-MMA WMC, 2012 WL 5392159, at *15 (S.D. Cal. Nov. 5, 2012) (granting final approval and consideringmultiple mediation sessions before multiple mediators and contentious nature of proceedings as convincing evidence settlement not a result of collusion).

### 1. The Strength of Plaintiffs' Case

Given the evidence adduced through discovery to date, Plaintiffs believe they likely would succeed if the case proceeded to trial. However, given the heavy obstacles and inherent risks Plaintiffs face with respect to the novel claims in data breach class actions, including, class certification, summary judgment, and trial, the substantial benefits the Settlement provides support final approval of the Settlement.

### 2. The Risk, Expense, Complexity, and Likely Duration of Further Litigation

In evaluating the strength of the case, the court should assess "objectively the strengths and weaknesses inherent in the litigation and the impact of those considerations on the parties' decisions to reach [a settlement]." *Adoma v. Univ. of Phoenix, Inc.*, 913 F.Supp.2d. 964, 975 (E.D. Cal. 2012). "In assessing the risk, expense, complexity, and likely duration of further litigation, the court evaluates the time and cost required." *Id.* at 976. As the Court recognized in its Preliminary Approval Order, "[t]his case involves an enormous class and major litigation costs. Settlement at this stage prevents litigation regarding class certification and summary judgment and saves the expense of expert reports and further depositions." (Dkt. 289 at 6-7.) Accordingly, this factor weighs in favor of final approval.

Data breach cases, such as this one, are especially risky, expensive, and complex. There are numerous hurdles that Plaintiffs must overcome before the Court would find that a trial is appropriate, including class certification and summary judgment. In addition, establishing a cognizable injury tied to Defendants' conduct (as opposed to, for instance, another data breach), can present challenges. *See, e.g.*,

24

*Krottner v. Starbucks Corp.*, 406 F.App'x 129 (9th Cir. 2010) (holding that, although plaintiffs established injury-in-fact for standing purposes, they failed adequately to allege damages for purposes of their negligence claim).  Were the case to proceed in litigation, there would be numerous expert reports and costly depositions.  Plaintiffs would have to establish liability without the benefit of Experian's own forensic report, and it is far from certain that the Court would approve Plaintiffs' damages theory and certify the Class.  *See, e.g.*, *In re Austrian & Ger. Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 174 (S.D.N.Y. 2000) (recognizing that "[m]ost class actions are inherently complex and settlement avoids the costs, delays, and multitude of other problems associated with them").  Continued proceedings necessary to litigate this matter to final judgment would likely include substantial motion practice, extensive discovery, class certification proceedings, dispositive motion practice, and trial.

Conversely, the Settlement delivers a real and substantial remedy that fairly, reasonably, and adequately addresses the situation confronting Class Members without the risk and delay inherent in prosecuting this matter through trial and appeal. *See Chambers v. Whirlpool Corp.,* No. CV11-1733, 2016 WL 5922456, at *5-6 (C.D. Cal. 2016) (affirming order certifying class for settlement purposes only and finding it "significant that Class Members [would] receive 'immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation.'") (quoting *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.,* 221 F.R.D. 523, 526 (C.D. Cal. 2004)).  Given that all Class Members will be eligible to receive Credit Monitoring and Insurance Services, as well as cash payments, the Settlement compensates them for the types of damages they suffered without the substantial risk of continued litigation.  Thus, this factor supports final approval.

### 3. The Risk of Maintaining Class Action Status Throughout the Trial

Although Plaintiffs prepared and shared with Experian a draft of their class certification motion, there is little authority relating to data breaches that Plaintiffs

25

can rely on to determine how the Court would rule on their motion.  This makes the risk of Plaintiffs obtaining class certification great.  *See Whirlpool*, 2016 WL 5922456 at *6 ("Because plaintiffs had not yet filed a motion for class certification, there was a risk that the class would not be certified.").  Data breach law is continuously developing so that, even if Plaintiffs obtained class certification, there is no guarantee that the class action status would be maintained.  Defendants would likely appeal any decision by the Court, resulting in additional delay to Class Members.  Moreover, the Court could decide to certify the Class for liability purposes but require Class Members to prove their respective damages individually, likely requiring individual trials for each Class Member to receive a benefit.  *See, e.g.*, *Smith v. Triad of Alabama, LLC*, No. 1:14-CV-324-WKW, 2017 WL 1044692, (M.D. Ala. Mar. 17, 2017), *on reconsideration in part*, 2017 WL 3816722 (M.D. Ala. Aug. 31, 2017) (adopting this bifurcated approach).  The significant risk of obtaining and maintaining class certification in this case supports final approval.

### 4.     The Amount Offered in Settlement

"[T]he very essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest hopes."  *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998) (internal quotation marks omitted).  As explained above, the Settlement value of $172.5 million is in line with, or superior to, other recent data breach settlements:

- *Anthem*: $110 million settlement fund, which included $37.95 million in attorney fees (reduced to $31.05 million), for 78.8 million insureds.  Although class members were eligible for similar benefits, only those who did not elect credit monitoring services were eligible for alternative cash payments.
- *Home Depot*: $13 million settlement fund, plus $6.5 million (paid out of the settlement fund if funds remained after claims) for credit monitoring services, and $7.5 million in attorney fees, for a class of over 40 million consumers.

- *Target*: $10 million settlement fund and $6.75 million in attorney fees for up to 110 million Target consumers who had their payment data acquired by unauthorized parties.

The Settlement before the Court should take its place among the settlements cited above as an excellent result for the Class.  Thus, this factor strongly supports final approval of the Settlement.

### 5.    The Extent of Discovery Completed and the Stage of the Proceedings

As the Court recognized, "extensive discovery has been taken in this case, including depositions of Experian employees, document review, and verified responses by Experian." (Dkt. 289 at 7.)  The Settlement was reached near the end of the discovery period, after Plaintiffs deposed many of Experian's current and former employees, reviewed many documents, and conducted an immense amount of research and investigation into the Data Breach along with their experts.  Similarly, class representatives provided verified responses to extensive discovery served by Experian.  Plaintiffs obtained sufficient information through discovery to make an informed decision regarding Settlement.

In addition, several motions were filed with the Court, including Defendants' motion to dismiss the complaint and Plaintiffs' motion to compel the third-party forensic report.  Plaintiffs conducted extensive research and drafted a motion for class certification.  As a result, Plaintiffs are well aware of the risks involved if they were to proceed with class certification and trial.  Given the advanced stage of these proceedings, Class Counsel have a clear view of the strengths and weaknesses of the case and to recommend that the Court grant final approval to the Settlement. (Wolfson Decl. ¶¶ 2-3; Robinson Decl. ¶¶ 2-3.)  This factor supports final approval of the Settlement.  *See, e.g.*, *In re Mego Fin. Corp. Secs. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) (holding "significant investigation, discovery and research" supported

"district court's conclusion that the Plaintiffs had sufficient information to make an informed decision about the Settlement").

### 6.    The Experience and Views of Counsel

"Great weight is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation . . . because parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in the litigation." *Whirlpool,* 2016 WL 5922456 at *7 (quoting *Nat'l Rural Telecomms. Coop.,* 221 F.R.D. at 528)); *see also Rodriguez v. W. Publ'g Corp.,* 563 F.3d 948, 697 (9th Cir. 2009) ("Parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's outcome in litigation.").

Class Counsel here include attorneys who have substantial experience serving as counsel in numerous complex actions, including in other data breach cases. (Wolfson Decl. ¶¶ 3-5; Robinson Decl. ¶¶ 3-5.)  They fully endorse the Settlement as fair, reasonable, and adequate to the Class.  (Wolfson Decl. ¶ 2; Robinson Decl. ¶ 2.) This factor supports final approval.

### 7.    The Presence of a Governmental Participant

No governmental agency is involved in this litigation, but Experian notified the Attorney General of the United States and Attorneys General of each State about the proposed Settlement, in accordance with the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1715, on February 8, 2019.  None of these attorneys general have raised any concerns or objections to date.

Under 28 U.S. Code § 1715(d), the Court may not issue a final approval order until May 9, 2019, 90 days after Experian issued this CAFA notice.

### 8.    The Reaction of the Class Members to the Proposed Settlement

"[T]he absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement

1  [] are favorable to the class members." *Whirlpool*, 2016 WL 5922456, at *6 (quoting

2  *Nat'l Rural Telecomms. Coop.*, 221 F.R.D. at 529).

3       Class Members' reaction to the Settlement has been overwhelmingly positive.

4  Although Class Members have a few more days to submit claims, the Objection

5  Deadline has passed, and the Opt-Out Period is over.[6]  As discussed above, the

6  response from Class Members has been extremely positive.  As of April 8, 2019, of

7  the 14,931,074 million Class Members, only 519 Class Members individuals have

8  opted out and just six objections have been submitted – a miniscule percentage (far

9  less than one tenth of 1%) of the Class.  (Lucchesi Supp. Decl. ¶¶ 11-12.)  By contrast,

10 the Settlement Administrator reports that a total of 434,998 unique claims have been

11 received.  (*Id.* ¶ 8.)  The relatively high participation rate, miniscule number of opt-

12 outs, and few objections all demonstrate that the Settlement has been overwhelmingly

13 well received by Class Members.

14                    **9.      Class Certification Remains Appropriate**

15      In its Preliminary Approval Order, the Court certified the Class for settlement

16 purposes.  (Dkt. 289 at 7.)  Nothing has changed since the Court's ruling at that time

17 to call the Court's conclusions regarding class certification into question.

18 Accordingly, Plaintiffs ask that the Court finally certify the Settlement Class for

19 settlement purposes in its order granting final approval to the Settlement.

20

21

22

23

24

25

26

27

28

---

[6] Before the final approval hearing, the Court will receive and be able to review all final claims numbers, along with a full accounting of all opt-out requests and objections, even if submitted after the deadline for such submissions.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## VI.  CONCLUSION

For all the reasons explained above, the proposed Settlement is fair, reasonable, and adequate, and merits final approval.  Accordingly, Plaintiffs respectfully request that the Court grant this motion and enter an order finally approving the Settlement and entering Judgment as requested herein.

Dated: April 8, 2019

**AHDOOT & WOLFSON**                          **ROBINSON CALCAGNIE, INC.**

By: */s/ Tina Wolfson*                              By: */s/ Daniel S. Robinson*
       Tina Wolfson                                       Daniel S. Robinson

*Class Counsel*

Sherrie Savett, Esq.                              Daniel C. Girard, Esq.
**BERGER & MONTAGUE PC**                **GIRARD SHARP LLP**
1622 Locust Street                               601 California Street, 14th Floor
 Philadelphia, PA 19103                       San Francisco, CA 94108
Tel: (215) 875-3000                             Tel: (415) 981-4800
Fax: (215) 875-4604                            Fax: (415) 981-4846
ssavett@bm.net                                   dgirard@girardsharp.com

Cari Campen Laufenberg, Esq.              Christopher P. Ridout, Esq.
**KELLER ROHRBACK, LLP**                **ZIMMERMAN REED, LLP**
1201 Third Avenue, Suite 3200            2381 Rosecrans Avenue, Suite 328
Seattle, WA 98101-3052                       Manhattan Beach, CA 90245
Tel: (206) 623-1900                             Tel: (877) 500-8780
Fax: (206) 623-3384                            Fax: (877) 500-8781
claufenberg@kellerrohrback.com        christopher.ridout@zimmreed.com

MOTION FOR FINAL APPROVAL

1

Joseph N. Kravec, Jr., Esq.

2

**FEINSTEIN, DOYLE, PAYNE & KRAVEC, LLC**

3

Law & Finance Building, 13th Floor
429 Fourth Avenue

4

Pittsburgh, PA 15219

5

Tel: (412) 281-8400
Fax: (412) 281-1007

6

jkravec@fdpklaw.com

7

*Plaintiffs' Steering Committee*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Andrew P. Bell, Esq.
**LOCKS LAW FIRM**
801 N. Kings Highway
Cherry Hill, NJ 08034
Tel: (856) 663-8200
Fax: (856) 661-8400
abell@lockslaw.com

MOTION FOR FINAL APPROVAL

1

**ATTESTATION OF FILER**

2      I, Tina Wolfson, attest that all other signatories whose electronic signature

3  ("/s/") appears above, on whose behalf the filing is submitted, concur in the filing's

4  content and have authorized the filing

5

6  Dated: April 8, 2019            */s/ Tina Wolfson*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28